**Chowdary M. ANWAR, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**Nos. 85–CV–1650, 83–CR–2.**

United States District Court, N.D. New York.

Nov. 18, 1986.

David A. Lenihan, Albany, N.Y., for petitioner.

Frederick J. Scullin, Jr., U.S. Atty. for N.D.N.Y., Albany, N.Y., for respondent; David R. Homer, Asst. U.S. Atty., of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Chief Judge.

In this motion brought pursuant to 28 U.S.C. § 2255 (1982) the petitioner, Chowdary Anwar, challenges his conviction in federal court after a jury trial on four counts of conspiracy to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1982). Petitioner claims he was afforded ineffective assistance of counsel due to a conflict of interest on the part of his trial lawyer in violation of his sixth amendment right to counsel and his fundamental right to a fair trial.

### I. BACKGROUND

The scenario developed by the government at trial is as follows: In the summer of 1981, petitioner, a Pakistani national, obtained approximately one kilogram of pure, brown Pakistani heroin from Muhammed Aslam, his contact in Pakistan. (Trial Transcript 128). Petitioner then delivered the heroin to James Grieco in Albany, who agreed to find a buyer for the drug and to split any profits with petitioner. (Tr. 360–65). They agreed to refer to the drug in future conversations as "carpets" or "bottles of whiskey." (Tr. 365). Petitioner also insisted that he was not to meet any potential buyer, on the theory that if the conspirators minimized the number of individuals who had contact with them, the risk of exposure would be reduced. (Tr. 365–66). Thereafter, Grieco solicited the help of Berton Hunter, who agreed to try to find a buyer for the heroin. It was agreed that Hunter would not meet petitioner, and that Grieco would not meet any buyer that Hunter located, again for security reasons. (Tr. 369–70).

A month passed without Grieco or Hunter finding a buyer. Petitioner then informed Grieco that the supplier in Pakistan wanted the heroin returned. Petitioner instructed Grieco to remove approximately eight ounces of heroin before returning the drug, however, and to replace it with brown sugar. The packets of heroin and sugar were then delivered to petitioner. (Tr. 376–77). In November and December 1981 Grieco and Hunter sold the eight ounces of heroin that had been retained to Vic Lindberg for $29,000, of which petitioner received $19,000. (Tr. 377–82).

In the spring of 1982 a Pakistani heroin ring headed by Khwaja Majid and Zulkarnen Khan smuggled approximately four kilograms of heroin into the United States via Sherul Zaman Khan (Zaman). Zaman stayed at the Philadelphia residence of Zafar Qureshi, and kept the heroin at the same residence. (Tr. 109–12). Majid Kahn thereafter telephoned Zaman and instructed him to await a telephone call from a "Mr. Javed" from Albany, New York. Within a couple of days, "Javed" attempted to contact Zaman. In a subsequent telephone conversation, Zaman agreed to deliver the drugs to "Javed." (Tr. 112–16). In April or May 1982 Zaman and Qureshi delivered approximately 1.5 kilograms of heroin to "Javed" in Albany. (Tr. 116–20). Quereshi identified petitioner as "Javed,"

the man to whom the contraband was delivered. (Tr. 122–23). Petitioner paid Zaman $6,000 as a courier fee and agreed to pay an additional $14,000 upon the sale of the heroin. (Tr. 123–25). Petitioner delivered the heroin to Grieco, and Grieco and Hunter again sought out buyers. (Tr. 385–92).

Meanwhile, in June 1982, Majid ordered Qureshi to deliver 2.5 kilograms of heroin to Ali Malik in Brooklyn. By this time, however, Malik was cooperating with the Drug Enforcement Administration (DEA). When Qureshi arrived in Brooklyn to deliver the heroin to Malik, he was arrested. Thereafter, Qureshi also agreed to cooperate with the government. (Tr. 133–41).

Qureshi placed a series of telephone calls to petitioner in Albany advising him that he had a buyer for the heroin he had delivered to petitioner earlier that spring. These conversations were tape recorded.[1] In one recorded conversation, Qureshi advised petitioner that this buyer was willing to pay $80,000 for a kilogram of heroin. Qureshi agreed to repay petitioner the $6,000 that was previously paid to Zaman plus an unspecified additional amount if petitioner would supply the heroin to complete the deal. (Tr. 145–53). On June 30, 1982 Qureshi, in custody, and DEA Special Agent Emilio Garcia, posing as a buyer, met petitioner in an Albany hotel room to complete the deal. Petitioner did not have the drugs with him. Surprised by the unexpected presence of Garcia, petitioner suspected that Qureshi was cooperating with the government and refused to discuss any

transaction. After thirty-five minutes, petitioner terminated the meeting. (Tr. 155–61). Petitioner, however, apparently verified that Qureshi had been arrested and concluded that the suppliers in Pakistan would believe that the heroin then in the possession of Grieco had been seized from Qureshi at the time of his arrest. Petitioner then advised Grieco that whatever proceeds could be obtained from the sale of the heroin in Grieco's possession was theirs to keep, and that the Pakistani suppliers would be none the wiser. (Tr. 393–401).

Ultimately, an acquaintance of Grieco and Hunter, James Massaro, introduced the two to Christopher Egan, a DEA Special Agent posing as a figure from the Boston underworld. Grieco and Hunter sold Egan seven ounces of heroin on December 18, 1982 for $16,500, which was split among petitioner, Grieco, Hunter, and Massaro. Future deals were discussed, and it was agreed that an additional nineteen ounces of heroin would be sold to Egan for approximately $80,000. Upon delivery of the heroin to Egan on January 5, 1983 Hunter was arrested. (Tr. 93–99/12). Grieco and petitioner were arrested soon thereafter, and a marked $100 bill used in the December 18, 1982 transaction was found in petitioner's possession. (Tr. 564–69).

On January 12, 1983 a grand jury in Syracuse indicted petitioner, Grieco and Hunter on four counts of conspiracy to distribute heroin and possession with intent to distribute heroin in violation of 21 U.S.C. §§ 846 and 841(a)(1)(1982).[2] At his arraign-

---

[1] These taped telephone conversations were translated and transcribed. The transcripts were marked in evidence as Government Exhibits 4a, 5a, 6a, 7a, 4b, 5b–5f, and 6b–6e and read to the jury. (Tr. 306–56).

[2] 21 U.S.C. §§ 841(a)(1) makes it "unlawful for any person knowingly or intentionally ... to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1) (1982). Section 846 provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission

of which was the object of the attempt or conspiracy." 21 U.S.C. § 846(1982).

The indictment charged petitioner, Grieco and Hunter with the following four counts: First, conspiracy with each other and with unknown others from on or about June 1981 until the date of the indictment to "knowingly, intentionally, and unlawfully distribute heroin, a Schedule I controlled substance, in violation of Section 841(a)(1) of Title 21, United States Code," in violation of 21 U.S.C. § 846 (1982); second, possession on or about December 18, 1982 with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1)(1982); third, distribution of a controlled substance on or about December 18, 1982 in violation of 21 U.S.C. § 841(a)(1)(1982); and fourth, posses-

ment before then-United States District Judge Roger J. Miner on January 14, petitioner was represented by Paul T. DeVane, Esq. At the arraignment, all three defendants pleaded not guilty, but on March 11, 1983 Grieco pleaded guilty on two of the four counts in satisfaction of the indictment. A week later, Hunter also pleaded guilty to two counts.

Though not representing Grieco on the charges arising out of the events described above, attorney DeVane had known Grieco since the early 1970s and had represented him in a variety of matters, including a real estate transaction, a pending divorce action and the defense of certain traffic violations. When Grieco pleaded guilty, it became apparent that Grieco would testify at petitioner's trial. DeVane, in part because of the potential conflict of interest raised, sought and obtained court leave to withdraw as petitioner's attorney.[3] On March 18, 1983 DeVane was replaced by Bertrand Gould, Esq.

On April 27, 1983 Gould represented petitioner at his suppression hearing. The trial commenced on the afternoon of the same day. On May 4, 1983 the jury convicted petitioner on all counts of the indictment. Petitioner was sentenced to four consecutive four and one-half year terms of imprisonment, totaling eighteen years, plus a spe-cial parole term of three years. In November 1985 the instant motion to vacate petitioner's conviction and sentence pursuant to 28 U.S.C. § 2255 (1982) was filed.

Petitioner alleges that at the time of their representation of petitioner, DeVane and Gould were *de facto* law partners. (Doc. 101, at 2, 308). Petitioner claims that Gould assisted DeVane before DeVane asked to be excused as petitioner's counsel, that the two attorneys shared the fee paid by petitioner, that both attorneys worked out of the same office, and that they otherwise conducted business as partners. It is also alleged that DeVane, at the urging of Grieco, sought out and "thrust himself" upon petitioner after the arrest, becoming petitioner's counsel. As DeVane prepared to take petitioner's case to trial, Grieco negotiated a plea and received a reduced sentence. On the eve of petitioner's trial, DeVane arranged to have his *"de facto"* law partner, Gould, substituted as counsel. At trial, Grieco became the prosecution's "star witness," essential to the conviction of petitioner. Gould, it is alleged, was unprepared and represented petitioner so ineffectively that petitioner received the most severe sentence ever rendered in this district for the crime with which he was charged. All of this, petitioner claims, was

sion, on or about January 5, 1983, with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1)(1982).

**3.** By letter dated March 16, 1983 Assistant United States Attorney David R. Homer informed DeVane that the government intended to call Grieco to testify against petitioner and that a potential conflict of interest existed. Two weeks earlier, on or about March 1, 1983, DeVane had been notified by the New York Supreme Court, Appellate Division, Third Judicial Department, that he would be suspended from the practice of law for a period of six months commencing May 1, 1983 due to his neglect of his client's matters in two cases unrelated to petitioner's case. Shortly thereafter, DeVane decided not to appeal his suspension and to request that his suspension commence on April 1 rather than May 1. On March 18, 1983, on the eve of petitioner's trial, DeVane and Gould claim to have informed petitioner both of the suspension and the conflict of interest and that he had the choice of having Gould substituted as counsel, retaining new counsel, or having the court appoint new counsel for him. Petitioner agreed to have Gould represent him at trial, and at a hearing held later that day before the Honorable Roger J. Miner, then-United States District Judge, Gould was substituted for DeVane as petitioner's counsel with petitioner's consent. *See* Affidavit of Paul T. DeVane, Answer in Opposition to the Motion of Defendant Chowdary M. Anwar under 28 U.S.C. § 2255, Ex. 1 (hereinafter Affidavit of DeVane); Affidavit of Bertrand F. Gould, Answer in Opposition to the Motion of Defendant Chowdary M. Anwar under 28 U.S.C. § 2255, Ex. 2 (hereinafter Affidavit of Gould).

The government does not contend that the hearing held on March 18, 1983 complied with the requirements of *United States v. Curcio,* 680 F.2d 881 (2d Cir.1982), nor that it was intended that petitioner's consent to the substitution of Gould would also constitute a waiver of his right to be represented by an attorney unconstrained by a conflict of interest. *See infra,* note 5.

part. of a scheme to obtain leniency for Grieco at the expense of petitioner's right to a vigorous defense. This depiction of events forms the basis of petitioner's § 2255 motion.

## II. DISCUSSION

■ When a prisoner in federal custody brings a motion under 28 U.S.C. § 2255 (1982)[4] to vacate, set aside or correct his sentence, the court must first determine whether an evidentiary hearing need be held. Section 2255 requires such a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." *See Fontaine v. United States,* 411 U.S. 213, 215, 93 S.Ct. 1461, 1462, 36 L.Ed.2d 169 (1973). In addressing this threshold inquiry, the court must ascertain whether a petitioner's affidavit, read in conjunction with the available record, is sufficient on its face to warrant a hearing. *Dalli v. United States,* 491 F.2d 758, 760 (2d Cir. 1974); *see also Newfield v. United States,* 565 F.2d 203, 207 (2d Cir.1977); *Williams v. United States,* 503 F.2d 995, 998 (2d Cir.1974); *Word v. United States,* 616 F.Supp. 695, 699 (S.D.N.Y.1985). Affida-

vits submitted by the government in opposition to a § 2255 motion cannot be deemed a part of the "records and files of the case" for the purpose of determining whether petitioner is entitled to a hearing, *Taylor v. United States,* 487 F.2d 307, 308 (2d Cir. 1973), though such affidavits "may be considered in assessing the sufficiency of the petitioner's supporting affidavit." *Dalli,* 491 F.2d at 762 n. 4; *see also Wright v. United States,* 732 F.2d 1048, 1057 n. 10 (2d Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985); *United States v. Franzese,* 525 F.2d 27, 31 (2d Cir.1975), *cert. denied,* 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 328 (1976). Further, conclusory statements in a petitioner's affidavit will not suffice; "[t]he petitioner must set forth specific facts which he is in a position to establish by competent evidence." *Dalli,* 491 F.2d at 761 (citing *Machibroda v. United States,* 368 U.S. 487, 495–96, 82 S.Ct. 510, 514–15, 7 L.Ed.2d 473 (1962)).

■ In his affidavit, petitioner claims he was denied effective assistance of counsel as a result of a conflict of interest on the part of his defense attorney in violation

---

4. 28 U.S.C. § 2255 provides:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

A motion for such relief may be made at any time.

Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as

to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

A court may entertain and determine such motion without requiring the production of the prisoner at the hearing.

The sentencing court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner. An appeal may be taken to the court of appeals from the order entered on the motion as from a final judgment on application for a writ of habeas corpus.

An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

28 U.S.C. § 2255 (1982).

of his sixth amendment right to counsel. Ordinarily, a petitioner alleging ineffectiveness of counsel must establish (1) that his attorney's performance was so deficient and riddled with "errors so serious that counsel was not functioning as the 'counsel' guaranteed the [petitioner] by the Sixth Amendment;" and (2) that the deficient performance prejudiced the defense to such an extent that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984); *Cuevas v. Henderson,* 801 F.2d 586, 589–90 (2d Cir.1986). However, "[p]rejudice is presumed ... if the [petitioner] demonstrates that counsel 'actively represented conflicting interests' and 'that an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067 (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 350, 348, 100 S.Ct. 1708, 1718, 1719, 64 L.Ed.2d 333 (1980) (footnote omitted)); *United States v. Iorizzo,* 786 F.2d 52, 58 (2d Cir.1986). Thus, a petitioner is entitled to a hearing under § 2255 if he alleges facts sufficient to establish that his lawyer had an actual conflict of interest, and that a "lapse in representation" resulted from the conflict. *Cuyler,* 446 U.S. at 349, 100 S.Ct. at 1718–19; *Iorizzo,* 786 F.2d at 58.

### A. Petitioner's Allegations of a Conflict of Interest

■■■ In order to establish a presumption of prejudice arising out of an alleged conflict of interest, "a defendant who raised no objection at trial must demonstrate that an *actual* conflict of interest adversely affected his lawyer's performance." *Cuyler,* 446 U.S. at 348, 100 S.Ct. at 1718 (emphasis added). A potential conflict of interest is not sufficient. *Bryan v. United States,* 645 F.2d 842, 843 (9th Cir. 1981). Whenever a defense attorney has previously represented an important government witness who testifies against his client, the possibility of a conflict of interest exists.[5] *See Iorizzo,* 786 F.2d at 57; *United States v. Shepard,* 675 F.2d 977, 979 (8th Cir.1982). Three major potential areas of conflict arise: the attorney's pecuniary interest in furthering his business relationship with the government witness may impair the attorney's ability to cross-examine the witness zealously, *see Shepard,* 675 F.2d at 979; *Model Code of Professional Responsibility* Canon 7, DR 7–101, DR 5–101 (1984); the attorney "may misuse confidential information obtained from the [witness], or may fail to fully cross-examine for fear of misusing confidential information," *Shepard,* 675 F.2d at 979; *see also United States v. Jeffers,* 520 F.2d 1256, 1264–65 (7th Cir.1975), *cert. denied,* 423 U.S. 1066, 96 S.Ct. 805, 46 L.Ed.2d 656 (1976); or the attorney may be required to testify about material aspects of the witness' testimony or otherwise place his own credibility at issue either in cross-examining the witness or in attacking the witness' testimony in summation. *See*

---

5. Because a criminal defendant has a constitutional right not to have his freedom to choose his own counsel constricted unnecessarily, a criminal defendant may knowingly and intelligently waive his right to an attorney of undivided loyalty. If he so chooses, a defendant in a criminal trial may be represented by an attorney who might be hindered by an actual or potential conflict of interest. *See United States v. Cunningham,* 672 F.2d 1064 (2d Cir.1982), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984). In *United States v. Curcio,* 680 F.2d 881 (2d Cir.1982), the Second Circuit established procedures through which a criminal defendant could waive his right to representation by an attorney free from a conflict of interest. In such cases, the trial court is obligated to advise the defendant of the dangers arising from the particular conflict, determine whether the defendant understands those risks and is willing to take them, and give the defendant time to contemplate the risks after encouraging him to seek advice from independent counsel. *Id.* at 888–90. Since attorney DeVane sought to be relieved from the case, compliance with these procedures with respect to DeVane was unnecessary. No potential conflict of interest on the part of attorney Gould was brought to the court's attention, and thus these procedures were not put into use with respect to Gould. Thus, petitioner did not effectively waive his right to representation by an attorney of undivided loyalty by consenting to the substitution of counsel in a hearing before Judge Miner on March 18, 1983.

*Iorizzo,* 786 F.2d at 57; *United States v. McKeon,* 738 F.2d 26, 34–35 (2d Cir.1984); *Model Code of Professional Responsibility* DR 5–102(A) (1984).

In the present case, petitioner does not allege that attorney Gould ever represented witness Grieco.[6] Instead, petitioner argues that DeVane and Gould were *"de facto* partners" and that the conflict of interest that prevented DeVane from representing petitioner should be imputed to Gould. Petitioner alleges that DeVane and Gould shared an office suite and shared rent and secretaries. In affidavits submitted in response to the present motion, DeVane and Gould admit this, but claim that they otherwise conducted business as sole practitioners, maintaining separate clients and refraining from sharing fees or income.[7] Petitioner further alleges that Gould assisted DeVane in the preparation of petitioner's case before DeVane asked to be relieved as petitioner's counsel. Petitioner cites a number of instances where the two attorneys visited him together at the Montgomery County Jail in Fonda, New York and the fact that Gould allegedly conferred with petitioner over the telephone while DeVane was still his attorney of record in support of his claim that he believed that both attorneys were in fact representing him. Indeed, both attorneys admit that they would assist each other for a fee on different cases by making court appearances or providing consultation or advice, and that in petitioner's case DeVane sought Gould's assistance because of the latter's experience in criminal cases.[8] Petitioner further alleges that the two attorneys shared in the fee paid by petitioner.

Petitioner's allegations, if true, do not indicate a general partnership relationship between DeVane and Gould extending beyond the representation of petitioner himself. It is not alleged that the two attorneys regularly shared clients; nor is it claimed that they represented themselves to the world at large as partners. It is commonplace for sole practitioners to share office space, office expenses, and secretaries. In sum, taking petitioner's allegations as true, the most that can be said is that DeVane and Gould were sole practitioners who worked together as *"de facto* partners" for the purpose of defending petitioner only.

The general rule in this Circuit is that in the absence of evidence that two attorneys are partners and that their interests overlap generally in the acceptance of clients and in the sharing of fees, a mere showing that "they worked in close physical proximity, that they shared an office and perhaps a secretary," by itself, is an "insufficient basis on which to erect a claim of conflict of interest." *United States v. Badalamente,* 507 F.2d 12, 21 (2d Cir.1974), *cert. denied,* 421 U.S. 911, 95 S.Ct. 1565, 43 L.Ed.2d 776 (1975); cf. *Davis v. Franzen,* 671 F.2d 1056, 1058–59 (7th Cir.1982) (no actual conflict of interest when co-defendants represented by different lawyers from same public defender's office). Thus, in order to prevail in his motion, petitioner must be able to establish that by working ·together on petitioner's case, Gould's representation of petitioner at the suppression hearing and at trial was tainted by the conflict of interest that caused DeVane to withdraw. Petitioner fails to allege facts that can establish this, largely because he focuses on the wrong attorney-client relationship.

Petitioner's allegations concern the joint efforts of DeVane and Gould in the preparation of his own defense; but the attorney-client relationship that gave rise to DeVane's potential conflict of interest was that of DeVane and the witness,

---

**6.** In his affidavit attached to the government's opposition papers, Gould expressly denies having ever represented Grieco in any matter. Affidavit of Gould ¶ 6.

**7.** In fact, the two attorneys claim that they shared the office suite with three other sole practitioners—Lawrence Dolan, Robert Meyer, and Thomas Flannery—and that office expenses, including rent and the salaries of the secretaries, were shared among the five attorneys. Affidavit of Gould ¶ 5; Affidavit of DeVane ¶¶ 5–7.

**8.** Affidavit of DeVane ¶¶ 8, 16; Affidavit of Gould ¶¶ 5, 7–8.

Grieco. Petitioner does not allege facts indicating that Gould was connected in any way with the representation of Grieco. By failing to allege facts sufficient to support the conclusion that Gould represented Grieco, petitioner failed to show that Gould had a pecuniary interest in furthering a business relationship with Grieco such that his ability to represent petitioner to the best of his ability was impaired; that Gould possessed confidential information obtained from Grieco hampering his ability to cross-examine Grieco vigorously; or that Gould's credibility could become a material issue when he attacked the testimony of Grieco on cross-examination and in summation. Petitioner has failed to allege facts supporting a conclusion that any of the potential areas of conflict arising when an attorney has previously represented an important witness for the prosecution existed in this case. Thus, petitioner has failed to demonstrate an "actual conflict of interest adversely affect[ing] his lawyer's performance," *Cuyler*, 446 U.S. at 348, 100 S.Ct. at 1718, and is not entitled to a presumption of prejudice under *Strickland* and *Cuyler*.[9]

### B. Sufficiency of Representation

 Even if petitioner were able to establish an actual conflict of interest, he could not obtain relief under § 2255 absent a showing that his attorney's performance was so inadequate that the attorney "was not functioning as the 'counsel' guaranteed the [petitioner] by the Sixth Amendment." *Strickland*, 446 U.S. at 687, 104 S.Ct. at 2064; *Cuevas v. Henderson*, 801 F.2d 586, 589 (2d Cir.1986). The standard for attorney performance is "reasonably effective assistance." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *Trapnell v. United States*, 725 F.2d 149, 151–52 (2d Cir.1983). "Reasonableness" must be gauged in light of all of the circumstances, 466 U.S. at 688, 104 S.Ct. at 2065, and "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689, 104 S.Ct. at 2065. To avoid placing any oppressive constraints on a defense attorney's wide latitude in making tactical decisions, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. at 2066 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)). Petitioner's specific allegations of misfeasance on the part of attor-

---

**9.** In order to prevail on a § 2255 challenge based on ineffective assistance of counsel in cases where the petitioner is not given the benefit of a presumption of prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. In light of this court's determination, see text, *infra*, that the record does not support petitioner's contention that attorney Gould's representation of petitioner fell below the standard of "reasonably effective assistance," 466 U.S. at 687, 104 S.Ct. at 2064, it is unnecessary to address this issue. However, it should be noted that even if Gould's performance was constitutionally deficient, petitioner was not prejudiced. A convicted defendant suffers no prejudice when the evidence presented at trial so overwhelmingly establishes his guilt that his attorney's error could not have affected the outcome. *See United States v. Sanchez*, 790 F.2d 245, 253–54 (2d Cir.1986). The most damaging evidence presented by the prosecution was the testimony of James Grieco (Tr. 356–447, 470–

91), the testimony of Zafar Qureshi (Tr. 102–90), the transcripts of translations of tape-recorded telephone conversations between petitioner and Qureshi which were read into evidence (Tr. 305–55), and a marked $100 bill from the December 18, 1982 purchase of heroin by undercover agent Egan found in petitioner's possession at the time of his arrest (Tr. 567). This evidence was supported by the testimony of agents Egan and Garcia, co-conspirator Hunter, a forensic chemist, and others. A recorded meeting of petitioner, Qureshi, and agent Garcia was admitted into evidence. (Government Ex. 7b). All told, the prosecution presented evidence over the course of a five day trial which convincingly portrayed petitioner as an active distributor of heroin in Upstate New York. The alleged errors committed by Gould, mostly involving the cross-examination of Grieco, are not "sufficient to undermine confidence in the outcome" of petitioner's trial in light of the extensive credible evidence introduced by the government against petitioner. *See Strickland*, 466 U.S. at 694–95, 104 S.Ct. at 2068–69.

ney Gould do not overcome this presumption of reasonable professionalism.

The most serious challenge to the effectiveness of Gould's representation of petitioner is the assertion that Gould failed to impeach Grieco's credibility by probing into his criminal record. Grieco's record before his guilty plea on March 11, 1983, however, consisted only of one conviction for petit larceny in 1962 and an arrest for the possession of a defaced firearm in 1972.[10] The 1962 conviction was more than ten years old and thus was not admissible under Fed. R.Evid. 609.[11] Further, since the 1972 arrest was more than ten years old and was not probative of Grieco's truthfulness or untruthfulness, it was inadmissible under Fed.R.Evid. 608(b).[12] Gould reasonably concluded that inquiry into Grieco's prior arrests was impermissible and did not pursue such questioning.

Petitioner also asserts that Gould's cross-examination of Grieco was marred by his failure to inquire into the seizure of weapons and money found in Grieco's apartment at the time of his arrest on January 5, 1983. Since no criminal charges were brought against Grieco as a result of this seizure, it could not be raised on cross-examination under Rule 609. Further, since the items seized were not relevant to Grieco's character for truthfulness or un-

---

**10.** Grieco's prior criminal record is related in the presentence report prepared by United States Probation Officer Alan J. Cunningham and dated May 9, 1983 for the sentencing of Grieco after his plea of guilty on two counts of the four count indictment which initiated the criminal action underlying petitioner's present civil action, Docket No. 83–CR–2.

**11.** Rule 609 provides, in pertinent part:
 (a) General rule
 For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.
 (b) Time Limit
 Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.
 Fed.R.Evid. 609.

**12.** Rule 608(b) provides:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.
Fed.R.Evid. 608(b).

Unlike Rule 609(b), *see* note 11, *supra,* which pertains to the admissibility of criminal convictions for the purpose of impeaching the credibility of a witness, Rule 608(b) does not, by its express terms, impose a ten-year "time limit" on the cross-examination of a witness concerning specific instances of conduct relevant to a witness's character for truthfulness or untruthfulness. However, the Advisory Committee Notes on the Proposed Rules of Evidence state that safeguards against abuse are built into Rule 608(b) "in the form of specific requirements that the instances inquired into be probative of truthfulness or its opposite *and not remote in time.*" Fed.R.Evid. 608 advisory committee note (emphasis added). This implies that the absence of a time limit in Rule 608 was an error in drafting. Regardless, courts in construing Rule 608, no doubt noting the inconsistency which would result if the credibility of a witness could not be attacked by reference to convictions that are more than ten years old but could be impeached by inquiry into mere arrests that are just as stale, have generally applied Rule 608(b) as if the time limits imposed by Rule 609 were a part of Rule 608. *See, e.g., United States v. Merida,* 765 F.2d 1205, 1216–17 (5th Cir.1985); *United States v. Toner,* 728 F.2d 115, 122 (2d Cir.1984).

truthfulness, such inquiry was not permissible under Rule 608(b).[13]

Petitioner contends that his defense was damaged by Gould's failure to question Grieco more fully about his acquaintance with at least three other men from Lahore, Pakistan, the origin of the heroin sold to undercover DEA Agent Egan. Apparently, petitioner believes that such inquiry might have left the jury with the impression that Grieco implicated petitioner in order to protect those men. This is speculative at best; it is just as possible that the jury would have inferred that these men were a part of a larger network of drug smugglers to which petitioner belonged. Under the circumstances, it was well within the bounds of reasonable trial strategy not to probe too deeply into a potentially damaging matter when the result of such inquiry was uncertain.

Petitioner also finds significance in Gould's failure to exploit a contradiction between the testimony given by Grieco and that of Berton Hunter. Grieco testified that he had given Hunter $5,000 after the sale of heroin to undercover DEA Agent Egan on December 18, 1982. (Tr. 418). Hunter testified that he had received only $4,900. (Tr. 552). Petitioner claims that this $100 discrepancy "could have been shown to have been the $100 alleged to have been found on [petitioner's] person." (Doc. 101, at 16). However, petitioner offered other evidence, through the testimony of petitioner's wife, Najma Anwar, to explain petitioner's possession of the marked $100 bill. Najma Anwar testified that she had given a woman change for the $100 bill while waiting in the check-out line at a supermarket and that she had given the $100 bill to her husband. (Tr. 581–82). It is possible that Gould reasonably concluded that contradictory "alibi" testimony would harm more than help petitioner's cause, and did not pursue the tactic petitioner now suggests.

The other tactical "errors" cited by petitioner are either minor, irrelevant or nonexistent.[14] Evaluating Gould's performance "from counsel's perspective at the time" of the trial and affording him a strong presumption that he exercised reasonable professional judgment, it cannot be said that his conduct fell outside "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2066.

## III. CONCLUSION

Petitioner has failed to allege facts which, if taken as true, would establish that attorney Gould had an actual conflict of interest at the time he represented petitioner. Petitioner has not alleged facts which, when considered in light of the files and records of this case, are sufficient to support his claim that Gould's performance was so inadequate that petitioner was not afforded "the 'counsel' guaranteed ... by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. Therefore,

---

**13.** For the text of Fed.R.Evid. 608(b), *see* note 12, *supra.*

**14.** For example, petitioner claims that Gould failed to challenge adequately the translations of tape-recorded telephone conversations between petitioner and Qureshi that were read into evidence (Tr. 305–55) by failing to stress the complexity of the Punjabi language in which these conversations were conducted. As example of erroneous translation, petitioner claims that the word "khaka," translated as "blueprints," could also mean "map" or "sketch," and that the word "gar," translated as "dwelling unit" or "apartment," could mean "house" or "home." Obviously, such discrepancies are meaningless in the context of the facts of this case.

Petitioner also claims that Gould failed to introduce as evidence the list of items seized from petitioner at the time of his arrest. This is simply not true. The entire list was read to the jury. (Tr. 573–75).

Petitioner alleges that Gould's failure to obtain fingerprint analysis of the packets of heroin entered into evidence at trial harmed petitioner's defense. Fingerprint reports on those packets would not have been helpful to petitioner, however, since the evidence introduced by the government indicated that Grieco had transferred the heroin delivered by petitioner into the packets introduced at trial. There was no evidence offered indicating that petitioner ever handled those packets, and thus the absence of his fingerprints from those packets would not help his defense.

petitioner is not entitled to an evidentiary hearing under 28 U.S.C. § 2255 (1982).

Petitioner's motion is denied.