Brij MITTAL, Petitioner,

v.

UNITED STATES OF AMERICA, Respondent.

No. 02 Civ.8449 JGK.
No. 98 CR.1302 JGK.

United States District Court, S.D. New York.

Nov. 15, 2006.

---

## OPINION AND ORDER

KOELTL, District Judge.

By opinion and order dated August 24, 2005 this Court denied the first amended petition of petitioner Brij Mittal which sought to vacate his conviction for participating in a kickback scheme in connection wit the Medicare program. *See Mittal v. United States*, 02 Civ. 8449, 2005 WL 2036023 (S.D.N.Y.2005). However, the Court determined to hold an evidentiary hearing on the allegations in the petitioner's second amended petition that he was denied the effective assistance of counsel because his trial counsel, Mark Marcus, had an actual conflict of interest in representing him at trial because Marcus was allegedly engaged in a scheme with Mohammed Rafikian, a/k/a "Mo Kian", to defraud Mittal out of more than $3 million. (*See* Pet'r's Post–Hr'g Mem. 2, 15.) The petitioner also alleges that he considered Rafikian, who was not a lawyer, to be his lawyer and that Rafikian suffered from an actual conflict because of the scheme to defraud Mittal. *Mittal*, 2005 WL 2036023 at *1. The petitioner also alleges that he paid $300,000 in legal fees and that $119,000 in an escrow account was not returned to him. *Id.*

The Court held an evidentiary hearing on November 15, 16, 17, and 30, 2005,[1] and the parties thereafter submitted post-hearing memoranda. Having considered the record, the Court makes the following findings of fact and reaches the following conclusions of law.

### I.

### A.

The petitioner was represented first at his initial appearance on the criminal complaint by Mark Marcus of Marcus & Associates. At that appearance on June 18, 1998, Marcus successfully obtained bail for the petitioner. (Docket entry June 18, 1998.) Shortly thereafter, Mittal retained Faith Gay to represent him in connection with the criminal case. Ms. Gay, an attorney experienced in criminal law, was a partner at Sidley & Austin at the time, and had been at the United States Attorney's Office for six years. (11/30 HT 4.)

In the course of her representation of Mittal, Gay discussed with Mittal the possibility of pleading guilty on many occasions. (*Id.* at 12–13.) As part of those discussions, Mittal, accompanied by Gay, had two proffer sessions with the Government in an effort to convince the Government to agree to move for a downward departure pursuant to section 5K1.1 of the Sentencing Guidelines based on his substantial cooperation with the Government in the investigation and prosecution of others. (*Id.* at 8–12; Exs. R–12, R–13.)

After the first such session on July 27, 1998, the Government indicated to Gay that it questioned Mittal's truthfulness as well as the completeness of his disclosure. (11/30 HT 9–10.) Gay discussed with Mittal the Government's concerns, and Mittal went to a second proffer session on October 26, 1998. (*Id.* at 9–11.)

While Gay discussed the possibility of a guilty plea with Mittal on many occasions, the Government was not prepared to offer any plea to Mittal that was acceptable to him. (*Id.* at 12.) Mittal wanted a guarantee that his medical license would be preserved, but there was no way that the Government could assure that. (*Id.* at 12,

---

1. Citations to the evidentiary hearing throughout this opinion will use the references "11/15 HT" for the November 15, 2005 hearing transcript, "11/16 HT" for the November 16 transcript, "11/17 HT" for the November 17 transcript, and "11/30 HT" for the November 30 transcript.

14) The Government was not prepared to offer a 5K1.1 letter, in part as a result of Mittal's apparently inadequate proffer session, and the Government also was not prepared to offer a plea to a misdemeanor. (*Id.* at 14–15, 25.)

Gay testified that there were serious plea discussions with the Government but could not recall a specific proposed agreement from the Government. (*Id.* at 25.) Gay analyzed the Sentencing Guidelines with Mittal and explained the strengths of the Government case. (*Id.* at 16–17.) Gay noted that by the time she was retained, it was too late to be the first person to cooperate, and she may have expressed that concern to Marcus when Marcus took over the representation of Mittal, but she felt that when she ceased to represent Mittal there was room to continue discussing a 5K1.1 letter. (*Id.* at 26.) However, this appears to be an unrealistic retrospective opinion in view of the length of time that Gay represented Mittal without obtaining such a letter, the fact that the other doctors subject to similar charges had already worked out dispositions with the Government, the fact that Mittal's proffer was viewed as inadequate, and the fact that no person has provided the Court with any basis to believe that Mittal had any information that would have been sufficient to cause the Government to offer Mittal a 5K1.1 letter.

A grand jury returned an indictment against Mittal on November 18, 1998. (Docket entry Nov. 18, 1998.) Gay continued to represent Mittal through pre-trial motions in the case. Mittal testified that he became dissatisfied with the fees charged by Gay and decided to change lawyers. He testified that Gay then told him that for an additional $100,000 she could negotiate a plea for him and that, prior to that time she had never spoken to him about the possibility of pleading guilty. (11/17 HT 51–53.) This testimony was not credible. It was not only inconsistent with Gay's more credible testimony, it was not credible in view of the two proffer sessions in which Mittal had participated, the purpose of which could not reasonably be divorced from a discussion of the possibility of a guilty plea.

On August 4, 1999, Mittal entered into a retainer agreement with Marcus & Associates to represent him in connection with his federal case. (Ex. P–25.) The agreement provided for a down payment of $10,000 and fees not to exceed $20,000 through trial. Marcus recalled discussing the possibility of a plea deal with the Government, but he was told that any plea would involve jail time and the loss of Mittal's medical license; there would be no plea agreement with a recommendation for probation. (11/15 HT 119–21; 11/16 HT 111–12.) Marcus's recollection, consistent with Gay's recollection, was that Mittal was not prepared to accept a plea that resulted in Mittal's loss of his license. (11/15 HT 119.) Mittal was the last of the doctors who had been arrested on similar charges, and, by the time that Marcus was retained, it was too late to obtain a favorable disposition such as probation for Mittal. (*Id.* at 128–29.) Marcus testified credibly that Mittal was upset that he had not obtained the disposition that other doctors had obtained and that Mittal was aware that the Government would only agree to a plea that included jail time and the loss of his license, and Mittal was unwilling to accept a plea that resulted in the loss of his license. (*Id.* at 132–33; 11/16 HT 111–15.)

While Mittal has contended on the present motion that he would have pleaded guilty if he had been told that a guilty plea was in his best interest (*see* Mittal Decl., Ex. R–17 ¶ 13), that assertion is not credible in view of the testimony of both Gay

and Marcus as to the defendant's unwillingness to entertain such a plea. Moreover, the defendant's assertion is also inconsistent with his allegations in his sworn declaration submitted in this case that "he did not intend to violate any laws" (Mittal Decl., Ex. R–16 ¶¶ 1, 3) and his sworn testimony that he did not receive kickbacks. (11/17 HT 72–74.) While the defendant's assertions of innocence, despite the powerful evidence against him, are not dispositive of whether the defendant would have pleaded guilty if advised to do so, they undercut the credibility of his assertion that he would in fact have pleaded guilty. *See Cullen v. United States*, 194 F.3d 401, 407–08 (2d Cir.1999) ("In assessing Cullen's credibility, the fact-finder would be entitled, but not required, to consider Cullen's continued protestation of innocence as weighing against the credibility of his claim....").

Mittal proceeded to trial and, on April 17, 2000, was found guilty by a jury of the four counts in the indictment. Mittal submitted a sworn declaration in which he asserts that "Mr. Kian and I had many discussions about my criminal case, and I considered him as much my lawyer as Mr. Marcus." (Mittal Decl., Ex. R–17 ¶ 4.) That allegation is not credible. Mittal was represented at trial by Marcus and by John Burnett who was hired to represent Mittal because of Marcus's health problems. (11/15 HT 130–31.) They also retained a private investigation firm. (*Id.* at 136–37.) It is undisputed that Rafikian is not a lawyer. (*Id.* at 146.) Understandably, therefore, Rafikian never filed a notice of appearance in the criminal case, never sat at counsel table, never questioned any witnesses or made any arguments, and never made a court appearance for Mittal. (*Id.* at 138; 11/17 HT 60–62.) Indeed, Mittal conceded at the evidentiary hearing that he could not say that Rafikian "was an attorney representing me. I told

you the firm was representing me. And the representative of the firm, which mainly was Mark Marcus and [Rafikian] who posed as an attorney. But he never made any court appearance." (11/17 HT 60–61.) To the extent that Mittal attempted to allege that he was relying on Rafikian for his representation in his criminal case, that allegation is not credible and is inconsistent with the lack of presence of Rafikian in the representation of Mittal in the criminal case.

While Mittal now attempts to assert that Rafikian was involved in his defense (*see, e.g., id.* at 60), such assertions are not credible. In his Declaration dated October 15, 2003, Mittal did not refer at all to Rafikian. (Mittal Decl., Ex. R–16.) Mittal referred to Mark Marcus as the attorney who represented him at trial and whose alleged failures should be the basis for vacating his conviction. (*Id.* ¶¶ 1–6.) Mittal also referred to Burnett, though he alleged that "Mr. Marcus was my counsel of choice to represent me, not Mr. John Burnett, Esquire." (*Id.* ¶ 5.) It was only after criminal charges were filed against Rafikian that Mittal submitted a Declaration in support of the Second Amended Petition asserting that "I considered [Rafikian] as much my lawyer as Mr. Marcus." (Mittal Decl., Ex. R–17 ¶ 4.)

To the extent that Mittal had any conversations with Rafikian about his criminal case, those conversations are more consistent with the fact that Mittal and Rafikian were friends than with Mittal's recent assertion that Rafikian was representing him in the criminal case. Mittal testified that he and Rafikian were close and that Rafikian referred to him a few times like a brother. (11/17 HT 23.) One exception is that at the time Marcus represented Mittal in connection with his arrest, Rafikian conducted an interview of Mrs. Mittal. (11/15 HT 112–13.) Mittal also testified to an

instance where he was upset with a trial examination conducted by Marcus and he complained to Rafikian who, in turn, became angry and came to the courthouse cafeteria and fought with Marcus. (11/17 HT 62–63.)

Marcus testified credibly that sometime after the trial, Mittal told Marcus that Rafikian was doing real estate closings and they both agreed that it was wrong because Rafikian was not a lawyer. (11/15 HT 142–47.)

Mittal was represented by new counsel in connection with post-trial motions and sentencing. Mittal was sentenced principally to thirty months imprisonment to run concurrently on all four counts of conviction. His conviction was affirmed on appeal. *United States v. Mittal,* No. 01–1318, 36 Fed.Appx. 20 (2d Cir. June 10, 2002).

### B.

Other aspects of the relationship among Marcus, Rafikian, and Mittal are relevant to the current motion. Marcus first met Rafikian in 1993 or 1994, and Marcus rented space from Rafikian. (11/15 HT 83, 84.) Rafikian was the principal in a company, First Investors Capital Corp. ("FICC"), that did credit restoration work for debtors. If Rafikian's clients were sued, Marcus would handle the litigation. (*Id.* at 83, 85–86.) Marcus denied being an officer of FICC (*id.* at 93), although he testified that he found out after the fact that Rafikian had made him an officer of FICC. (11/16 HT 109–110.) Patrick O'Sullivan, who became an independent contractor for FICC in the Spring of 2000, testified that he attended a meeting at which Marcus presented a business card listing himself as "Vice–President—Compliance" for FICC. (11/30 HT 38–39.) Marcus denied seeing the card before or after being an officer. (11/15 HT 93.) Marcus credibly testified

that he never owned any stock in FICC, never took anyone's money for FICC, and never received any payment for duties related to FICC. (*Id.* at 98; 11/16 HT 109–110.) Marcus also testified credibly that Rafikian signed Marcus's name without his authority. (11/15 102.)

Marcus used Rafikian to interview people for him after Marcus became ill in late 1997 or early 1998. (*Id.* at 86.) Rafikian also worked on real estate negotiations for Marcus under Marcus's directions, but Marcus denied that he was aware that Rafikian was doing any legal work. (*Id.* at 89–90.) From the Fall of 1999 through the end of 2000, Marcus represented Mittal in the sale of his medical practice. (*Id.* at 24–25, 35; Exs. P–1, P–2, P–3, P–4.) Rafikian also worked on that transaction, but Robert Egan, one of the attorneys working on the transaction for the buyer, testified that Rafikian said that he was not a lawyer. Egan said that Marcus was the attorney for Mittal and that Rafikian acted as a paralegal. (11/15 HT 24–29.) Marcus did not recall generally working on that transaction except for one problem in 2000, but Egan, as a disinterested witness, recalled credibly that Marcus did work on that transaction.

Marcus also represented Mittal with respect to the sale of property Mittal owned with his wife located at 261, 263 Fifth Avenue, Brooklyn, New York. (*See* Ex. P–9.) The bulk of the negotiations were, however, conducted by Rafikian, and the purchaser's attorney addressed Rafikian as an attorney and considered him to be an attorney at Marcus & Associates. (11/30 HT 29–31; Exs. P–7, P–27.) The contract of sale was entered into on April 26, 2000, after the trial in Mittal's criminal case had concluded. (Ex. P–9.) The purchaser paid $79,000 into an escrow account for Marcus & Associates, as attorneys for the sellers, at the time the contract was signed.

(11/30 HT 33; Ex. P–9.) The closing occurred in August, 2000, and Marcus was present for the closing. (11/30 HT 31; Ex. P–10.) Mittal claims that he never received the amount that he had paid into escrow or the proceeds of the sale. The two checks for the proceeds of the sale were part of the funds in excess of $3 million, discussed below, that Mittal and his wife gave to Rafikian. (Ex. P–15; 11/16 HT 151.) The amount paid into escrow was paid after the trial in this case had concluded and thus could not be the basis of any claimed conflict of interest during the trial.

Marcus also represented the Mittals in connection with a sale of property on Bragg Street. He appeared at the closing and the Mittals got a check for the sale of the property. (11/16 HT 149–50.) Marcus & Associates also represented the Mittals in connection with obtaining a $229,000 loan on property they owned. Mrs. Mittal testified she gave the check to Rafikian. (*Id.* at 151.)

During the trial, Mittal advised Marcus that he was contemplating making an investment with Rafikian, and Marcus advised Mittal against doing so. (11/15 HT 139–40.) Mittal and his wife did in fact invest a substantial amount of money with Rafikian. Between February 17, 2000 and August 22, 2000, the Mittals transferred in excess of $3.2 million to FICC based on promises by Rafikian that the money would be invested and would produce a return of thirty percent, less fees. (Exs. P–15, P–16; 11/16 HT 140–47.) The documents reflecting these transfers were prepared on the letterhead of FICC and were signed by Brij Mittal, Amita Mittal, Mohammed Rafikian, and Zeljka Radinovic, Rafikian's wife. (Exs.P–15, P–16.) Marcus was not a signatory to those documents. Beginning in about July, 2001, Mittal began to request statements and payments from Rafikian, not from Marcus. (Exs.P–

18, P–20, P–21, P–23.) Rafikian responded but produced only somewhat more than $200,000 in response to the complaints. (Exs. P–19, P–22; 11/16 HT 148–49.) Marcus testified credibly that he never received any money in connection with Mittal's investments with Rafikian. (11/15 HT 140.)

Rafikian denied defrauding the Mittals and claimed that his signature on various documents had been forged. (11/16 HT 23–28, 61–66.) However, the credibility of his testimony was undercut by his allegations of a conspiracy against him that implicated people in various Mid–East countries and Ireland and included a threat to national security. (*Id.* at 73–80.)

At the evidentiary hearing, the petitioner also introduced evidence that Rafikian defrauded other persons, specifically Robert Gottlieb, Peter Simonovic, and Mohammed Nayeem. Rafikian has been indicted by a grand jury in Queens County on various charges of grand larceny, criminal impersonation, fraud, and practicing or appearing as an attorney without being admitted or registered. (Ex. P–13.) The charges remain pending.

## II.

▮ In its decision ordering an evidentiary hearing, this Court already summarized the standards to be applied to the petitioner's claim of an actual conflict of interest by his attorney: In order to establish an actual conflict of interest has adversely affected the performance of defense counsel, the petitioner must show that counsel's interests diverged from the petitioner's on some material legal or factual issue and resulted in an actual lapse in representation. This is a three-part showing. First, the petitioner must show an actual conflict of interest, that is, that the attorney's and defendant's interests diverge with respect to a material factual or

legal issue or to a course of action. Second, the petitioner must demonstrate an actual lapse in representation that resulted from the conflict. An actual lapse in representation is demonstrated by the existence of some plausible alternative defense strategy not taken up by counsel. Third, Mittal must show that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests. *Mittal*, 2005 WL 2036023 at *13 (internal citations and quotation marks omitted). Mittal has failed to satisfy any of the three prongs of the test.

## A.

■ Mittal has failed to show that his counsel's interests diverged from Mittal's on some material legal or factual issue or with respect to a course of action.

The petitioner has no claim based on an alleged conflict of interest by Rafikian. Rafikian was not his lawyer in the criminal case and the petitioner points to no credible evidence to show that he was. Rafikian never filed a notice of appearance, never made a court appearance, and conducted none of the court proceedings. Moreover, Rafikian never negotiated with the Government on behalf of Mittal. Rafikian failed to provide that active representation of Mittal in the criminal case that would be necessary to trigger a claim of conflict of interest. *See Strickland v. Washington*, 466 U.S. 668, 692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Yost*, 98 Cr. 974, 2001 WL 536937, at *7 (S.D.N.Y. May 21, 2001), *aff'd sub nom., United States v. Feyrer*, 333 F.3d 110 (2d Cir.2003). Even when an attorney appeared for a defendant at trial and had very limited responsibility at the trial and had a per se conflict based on the attorney's participation in the crime of which the defendant was charged, the Court of Appeals for the Second Circuit declined to find a violation of the right to counsel. *See Triana v. United States*, 205 F.3d 36, 42–43 (2d Cir.2000). As the Court of Appeals explained:

> We hold that there is no *per se* violation of the right to counsel where the lawyer implicated in the crime is not the lawyer conducting the defense, and has done nothing that has bearing on the result.... It is despicable for a lawyer to appear in a case and serve as a spy for another interest, but where the lawyer functions as a spy and does not function as a lawyer in any work that bears on the outcome, application of the *per se* rule would be a legal fiction.

*Id.* at 43.

In this case, Rafikian, not even a lawyer, did not participate in the defense of Mittal in the criminal case, and any conflicts that he had with Mittal did not deprive Mittal of his right to conflict free counsel which he received from Marcus and Burnett.

Mittal argues that Rafikian should be considered to be his counsel because he was a de facto partner of Marcus. Mittal relies on *United States v. Jiang*, 140 F.3d 124 (2d Cir.1998), where the Court of Appeals noted:

> A showing that two attorneys are partners or represent 'themselves to the world at large as partners,' and whose interests overlap 'in the acceptance of clients and in the sharing of fees' is sufficient to ground a conflict of interest claim, assuming that there is proof that the clients' interests may have been in conflict.

*Id.* at 127 (quoting *Anwar v. United States*, 648 F.Supp. 820, 827 (N.D.N.Y. 1986), *aff'd*, 823 F.2d 544 (2d Cir.1987)). In this case, however, it is undisputed that Rafikian was not a lawyer and the credible evidence shows that Marcus did not hold Rafikian out as a partner. Even if Rafikian were a lawyer, there is no showing that

there was a general partnership such that any conflict he had was attributable to Marcus. *See Anwar,* 648 F.Supp. at 827. There was no sharing of fees or overlap in the acceptance of clients. There is no credible testimony that Marcus knew that Rafikian was performing legal work until after the trial in this action.

There is also no basis for finding that Marcus himself had a conflict of interest. Mittal alleges that Marcus was himself involved in Rafikian's scheme to defraud Mittal, and that Marcus and Rafikian had an interest in seeing that Mittal was convicted so that he would spend a considerable period of time in prison and not uncover the fact that Rafikian had stolen over $3 million from Mittal and his wife. However, there is in fact no evidence that Marcus was involved in the scheme to defraud Mittal. There is no evidence that Marcus profited from the investments that Mittal made with Rafikian, and Marcus testified credibly that he discouraged Mittal from investing with Rafikian. And indeed prior to the criminal charges being brought against Rafikian, Mittal repeatedly had sought the return of his funds from Rafikian and not from Marcus, and it was Rafikian who negotiated with respect to the return of the funds. By contrast, prior to the criminal charges being brought against Rafikian, the petitioner had never contended that Rafikian had represented him in the criminal action.

■ The petitioner also suggests that Marcus had a conflict of interest because Marcus received compensation for his representation of Mittal in the criminal case. (11/17 HT 20–21; Ex. R–17 ¶ 7.) Marcus recalled that he received $25,000 to $50,000 for the criminal representation, that Mr. Burnett received an amount close to $25,000, and that there were substantial expenses for an investigator. (11/16 HT 117–18.) The checks presented by Mittal at the hearing which were payable to Marcus and Associates did not support Mittal's contention that more than $300,000 was paid to Marcus & Associates for the representation of Mittal in the criminal case. Indeed the checks amounted to substantially less than $200,000 and some of them were plainly not related to the criminal case and related to other representation or to real estate transactions. (11/17 HT 5–21; Exs. P–38 to P–45.) In any event, the fact that a lawyer is paid for the representation is not a basis for a conflict of interest claim in the absence of some other factor such as a contingent fee arrangement. *See Winkler v. Keane,* 7 F.3d 304, 307–08 (2d Cir.1993) (contingency fee agreement created actual conflict of interest); *DeLeon v. Duncan,* 99 Civ. 9086, 2002 WL 1997892, at *12–*13 (S.D.N.Y. Aug.28, 2002) (trial court's authorization of enhanced compensation for court-appointed defense counsel did not create an actual conflict of interest).

The petitioner also claims that Marcus & Associates received various payments in escrow for real estate transactions, and these amounts were never delivered to Mittal after the transactions closed. (11/17 HT 21.) There is no evidence that these escrow funds were deposited prior to the conclusion of the criminal trial. In any event, there is no documentary evidence that Mittal requested the delivery of the escrowed funds from Marcus and that Marcus denied their return. Moreover, there is no showing why any dispute with respect to the escrow showed that Mittal's interest and Marcus's interest diverged on some material legal or factual issue. *Cf. United States v. O'Neil,* 118 F.3d 65, 71 (2d Cir.1997) (noting that a dispute between a defendant and counsel over payment of fees, without more, does not constitute a conflict of interest); *Narvaez v. United States,* 97 Civ. 8745, 1998 WL

255429, at *3 (S.D.N.Y. May 19, 1998) ("The existence of a fee dispute between a defendant and his attorney ... does not create an actual conflict of interest....").

**B.**

In any event, the petitioner has failed to establish any actual lapse in representation that resulted from any alleged conflict. The petitioner has failed to establish that there was some "plausible alternative defense strategy" that was not taken by counsel. *United States v. Moree*, 220 F.3d 65, 69 (2d Cir.2000) (quoting *Winkler*, 7 F.3d at 309). The petitioner suggests that the alternative defense strategy that was not pursued was the negotiation of a guilty plea. But this was not a plausible defense strategy for several reasons. As the evidence shows, the petitioner was not prepared to plead guilty on any terms that were available to him. Gay attempted to negotiate such a plea for over a year and was unsuccessful, and the petitioner also was not willing to enter any plea while represented by Marcus. *See Armienti v. United States*, 313 F.3d 807, 815 (2d Cir.2002) ("The facts surrounding Armienti's own refusal to pursue a plea agreement ... negate the notion that it was a plausible alternative under the adverse effects standard.").

Moreover, while the petitioner now attempts to argue that Marcus should have negotiated a 5K1.1 letter for him, there is no credible evidence that such a plea was available to him. As explained above, Gay was unable to negotiate such a plea and there is no assertion that she had any conflict. Marcus began to represent Mittal shortly before trial, after all of the other doctors had reached dispositions. There is no evidence in the papers of what evidence Mittal had to offer the Government that would have led the Government to offer a 5K1.1 letter to him and there is

no evidence why the Government would have been prepared to offer a 5K1.1 letter when Mittal was represented by Marcus, when it was unwilling to offer one when Mittal was represented by Gay, particularly in view of the fact that Mittal had given what the Government considered to be an inaccurate proffer. *See Yost*, 2001 WL 536937 at *7 ("However, there is no evidence in the record that pleading guilty and seeking to cooperate was ever an option for Yost because Yost does not aver that he was willing to do that, let alone what information he could have provided and how he could have prevailed on the government to accept his cooperation.").

Finally, Mittal's argument that pursuing a guilty plea was a plausible alternative is not credible in view of Mittal's persistent arguments that, for various reasons, he was innocent of the charges against him. Indeed, in the petitioner's October 15, 2003 declaration, the petitioner swore that "I did not intend to violate any laws," and "[t]here was no crime committed." (Mittal Decl., Ex. R–16 ¶¶ 1, 3.) During the evidentiary hearing, the petitioner testified that he did not intend to violate any criminal laws and that there was no kickback or remuneration given to him. (11/17 HT 73–74, 97.) The petitioner's testimony that he would have pleaded guilty to save money is not credible and is inconsistent with his continued protestations of innocence, even at the hearing (*Id.* at 97). *See Cullen*, 194 F.3d at 407–08; *Winkler*, 7 F.3d at 309.

**C.**

The petitioner has also failed to prove that Marcus declined to pursue the alternative defense strategy of having the petitioner plead guilty because of any alleged conflict. The petitioner suggests that Marcus wanted the plaintiff to be incarcerated for a long period of time so that he

would not discover any alleged fraud. (Pet'r's Post–Hr'g Mem. 16.) This argument is completely implausible. The petitioner would likely have been imprisoned after a guilty plea and there is no showing what the additional increment would have been simply because the defendant failed to obtain credit for acceptance of responsibility by going to trial. If, as the petitioner contends, there was an effort to see that he was imprisoned because it would be more difficult for him to discover any fraud, that would also have been accomplished by a guilty plea. Moreover, that Marcus sought to have Mittal imprisoned for a substantial period of time to keep him away is inconsistent with the fact that Mittal actually worked out of a desk in the same offices where Rafikian worked after Mittal was released from prison. (11/17 HT 29–30.)

### CONCLUSION

For the foregoing reasons, and the reasons explained in the Court's prior opinion, the petitioner has failed to establish that Rafikian was his counsel, that Marcus was laboring under an actual conflict of interest, or that any alleged conflict of interest justifies setting aside the conviction. Accordingly, the petition is **denied**.

Because the petitioner has failed to make a substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c).

**SO ORDERED.**