**UNITED STATES of America, Appellee,**

v.

**Chang Kui JIANG, Defendant,**

**Peter A. Mahiques, Appellant.**

**Docket 97–1245.**

United States Court of Appeals, Second Circuit.

Argued Feb. 4, 1998.

Decided March 19, 1998.

Patrick H. NeMoyer, United States Attorney, Western District of NY, Joseph J. Karaszewski, Assistant United States Attorney, Buffalo, NY, for appellee.

The Legal Aid Society, Federal Defender Division, Appeals Bureau, Steven M. Statsinger, New York City, for appellant.

Before: KEARSE and WALKER, Circuit Judges, WEINSTEIN, Senior District Court Judge*.

PER CURIAM:

In January 1996, Chang Kui Jiang and Peter A. Mahiques, appellant, were indicted on four counts: conspiring to violate immigration laws under 18 U.S.C. § 371 ("Count I"); alien smuggling in violation of 8 U.S.C. § 1324(a)(1)(A)(i) ("Count II"); transporting aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) ("Count III"); and induc-

---

* Jack B. Weinstein, Senior District Court Judge of the United States District Court for the Eastern District of New York, sitting by designation.

ing aliens to enter the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(iv) ("Count IV").

Jiang, a Canadian citizen, pled guilty to Count I in May of 1996 in the United States District Court for the Western District of New York, John T. Curtin, presiding. He was sentenced to probation. During his plea colloquy, Jiang admitted that he had conspired to transport illegal aliens and inculpated appellant by stating that they had assisted each other in bringing the aliens into the United States. As part of his plea agreement, Jiang promised to cooperate with the government during appellant's trial. After Jiang was sentenced—but prior to appellant's trial—forfeiture proceedings were instituted against his automobile, which allegedly had been used in commission of the crimes.

Prior to appellant's trial, Jiang had been shown a six photograph array during an interview with Agent James Higgins of the United States Immigration and Naturalization Service. Jiang was unable to identify appellant as his co-conspirator and he made statements which were potentially exculpatory to appellant. Shortly thereafter, Jiang returned to Canada to serve his period of probation.

Jiang was unavailable during appellant's trial, but his declarations exculpatory of appellant to Agent Higgins were admitted. The government was not permitted to impeach these statements with Jiang's plea colloquy implicating appellant.

During appellant's trial the government advised the judge that no record had been made of a pre-trial conversation among the parties and the court regarding defense counsel's possible conflict of interest. Appellant's trial counsel stated that his law partner was currently representing Jiang in the forfeiture proceeding. He assured the district court that "since Mr. Jiang is not going to be a witness and information that was obtained from Mr. Jiang . . . is not part of our defense in this particular case, I don't think there is a problem."

The transcript reads:

MR. KARASZEWSKI [for the United States]: We had a conversation before the trial began about a potential conflict of interest if you recall and we never put anything on the record with regard to that.

THE COURT: Conflict?

MR. HARRINGTON [for the defense]: Because of my partner representing Mr. Jiang in that forfeiture proceeding.

THE COURT: Oh, okay. You want to say something about that?

MR. HARRINGTON: Judge, as I disclosed to Mr. Karaszewski and to the Court before the trial, Mr. Jiang retained my partner, Mark Mahoney, regarding the forfeiture of his BMW which is a direct result of the criminal charges in this particular case, and it was only recently that it was discovered in my office that we in fact represented Mr. Mahiques and Mr. Jiang. I have not spoken with Mr. Jiang, although I have attempted to contact him. My partner, Mr. Mahoney, spoke to Mr. Jiang once, that's back early in this year, with an interpreter and in fact our office has not even been able to get a hold of Mr. Jiang for the past four or five months, but in any event, I disclosed that to Mr. Karaszewski that there was obviously a potential conflict of interest. It is my understanding that Mr. Jiang is not going to be called as a witness by the Government, and in terms of a conflict on the part of my client, Mr. Mahiques, any conflict in this particular case, other than his concern that I wouldn't rigorously represent him, I think is obviated by the fact that any knowledge I might have of Mr. Jiang would be helpful to Mr. Mahiques and a conflict problem for Mr. Jiang rather than Mr. Mahiques. But since Mr. Jiang is not going to be a witness and information that was obtained from Mr. Jiang by Mr. Mahoney is not part of our defense in this particular case, I don't think there is a problem.

THE COURT: Okay. It may not make any difference but was the forfeiture perfected by the Government?

MR. HARRINGTON: It's in litigation right now, Judge. There are attempts being made to settle it now.

MR. KARASZEWSKI: Judge ..., the Government doesn't object to proceeding....

After this colloquy, and without the court making a specific finding regarding the possible conflict, the trial resumed. Appellant was convicted on Counts I, II, and III, and received a sentence of two years' probation, four months of home confinement, 100 hours of community service, and a special assessment of $150.

*Discussion:*

■ Appellant argues that the court did not satisfy its duty of inquiry regarding a possible conflict of interest and that his conviction should be overturned under this circuit's "automatic reversal" rule. *See Ciak v. United States,* 59 F.3d 296, 302, 304–306 (2d Cir.1995); *United States v. Levy,* 25 F.3d 146, 153–54 (2d Cir.1994). Alternatively, he seeks reversal because the court did not obtain his waiver of his right to unconflicted counsel pursuant to *United States v. Curcio,* 680 F.2d 881 (2d Cir.1982).

■ The Sixth Amendment's right to counsel contains "a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981). In order to ensure that a criminal defendant's right to conflict-free counsel is not abridged, a district court must "initiate an inquiry when it knows or reasonably should know of the possibility of a conflict of interest." *Strouse v. Leonardo,* 928 F.2d 548, 555 (2d Cir.1991). This initial obligation to inquire arises whenever a district court is "sufficiently apprised of even the possibility of a conflict of interest." *Levy,* 25 F.3d at 153. When a possible conflict has been "entirely ignored" by the district court, reversal has been "automatic." *See id; see also Ciak,* 59 F.3d at 307 (discussing the "automatic reversal rule" and reversing on that basis); *United States v. Lussier,* 71 F.3d 456, 461 (2d Cir.1995) (suggesting that district court's failure to make conflict inquiry constitutes "per se reversible error"), *cert. denied,* 517 U.S. 1105, 116 S.Ct. 1321, 134 L.Ed.2d 474 (1996).

Here, the district court was made aware of a possible conflict of interest. "[A]ny doubt as to whether the court should have been aware of the [conflict] problem is dispelled by the fact that the [prosecution] raised the conflict problem explicitly" at trial. *Wood,* 450 U.S. at 272–73, 101 S.Ct. at 1104.

■ Jiang was represented by the law partner of appellant's trial counsel. A showing that two attorneys are partners or represent "themselves to the world at large as partners," and whose interests overlap "in the acceptance of clients and in the sharing of fees" is sufficient to ground a conflict of interest claim, assuming that there is proof that the clients' interests may have been in conflict. *Anwar v. United States,* 648 F.Supp. 820, 827 (N.D.N.Y.1986), *aff'd,* 823 F.2d 544 (2d Cir.1987); *see also Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384, 1387 (2d Cir.1976) (imputing disqualification to firm of attorney who was also a member of another firm that concurrently represented party with adverse interests "because of the peculiarly close relationship existing among legal partners"); Model Rules of Professional Conduct Rule 1.10 cmt. 6 (1983) ("Such situations can be considered from the premise that a firm of lawyers is essentially one lawyer for the purposes of the rules governing loyalty to the client, or from the premise that each lawyer is vicariously bound by the obligation of loyalty owed by each lawyer with whom the lawyer is associated.").

It is conceivable that Jiang's attorney might have had an interest in keeping his client off the witness stand—even though he might have exculpated appellant—for several reasons. First, Jiang's testimony at trial could possibly have been used against him in the pending forfeiture proceeding. Additionally, assuming that Jiang's testimony would have been consistent with his statements to Agent Higgins, he potentially faced perjury and obstruction charges in light of his statements inculpating appellant during his plea colloquy and in his plea agreement.

Yet, even were the trial court to find that Jiang's attorney might have had an interest in keeping him from testifying at appellant's trial, this would arguably present a conflict of interest only if appellant, represented by a

conflict-free attorney, might have found it useful for Jiang to testify. This possibility is substantially attenuated by the tactical situation. Jiang's failure to identify appellant in a photograph lineup, along with his other potentially exculpatory statements made to Agent Higgins, were ruled admissible by the district court, whereas his plea statement—which was potentially damaging to appellant—was excluded. If Jiang had testified on appellant's behalf at trial, his potentially damaging plea statement (i.e., that he aided appellant to violate United States immigration laws) might have been used to impeach his favorable testimony. In all probability, appellant's interests would not have been served by Jiang's presence on the witness stand.

During the pertinent colloquy, defense counsel assured the district court that "any knowledge I might have of Mr. Jiang would be helpful" to appellant, and that, "since Mr. Jiang is not going to be a witness and information that was obtained from Mr. Jiang by Mr. Mahoney is not part of our defense ..., I don't think there is a problem." Moreover, the district judge, who presided over Jiang's plea allocution and sentencing, might well have been aware of details of the pending parallel forfeiture proceeding or other aspects of the criminal proceedings that might have supported a conclusion that there was no potential or actual conflict. Other facts and arguments bearing on a conflict claim can be considered by the trial court on remand.

In view of these considerations, it cannot be said that the district court "entirely ignored" a possible conflict situation brought to its attention. *Levy*, 25 F.3d at 153. Rather, the record contains affirmative indications, of which the district court was plainly aware, that defense counsel was unlikely to be laboring under a conflict of interest. Most notably, in light of the district court's evidentiary rulings, it is difficult to see how appellant could have benefitted from Jiang's appearance at trial. It would be inappropriate to now apply the "automatic reversal" rule. *See id.* In this case, it is desirable to decide the issue only after a factual finding based upon an evidentiary hearing at *nisi prius*, rather than by an analysis of hypotheticals at the appellate level.

■ We also reject appellant's contention that reversal is required on the ground that the district court did not address him personally and did not seek his waiver of his right to unconflicted counsel. If the district court had determined that defense counsel suffered from an actual or potential conflict, it would have been obligated to ascertain whether appellant waived the conflict. *See Curcio,* 680 F.2d at 888–90. As noted in *United States v. Iorizzo,* 786 F.2d 52, 59 (2d Cir.1986), a trial court should:

> (i) advise the defendant of the dangers arising from the particular conflict; (ii) determine through questions that are likely to be answered in narrative form whether the defendant understands those risks and freely chooses to run them; and (iii) give the defendant time to digest and contemplate the risks after encouraging him or her to seek advice from independent counsel.

Exercise of the waiver option is no longer possible.

The practice of obtaining a knowing and intelligent waiver from a criminal defendant whose counsel, the trial court has determined, is even possibly conflicted, serves to protect that defendant's Sixth Amendment rights and simultaneously ensures that district courts do not walk "unwittingly" into the "mine field" of conflicts of interest. *See Levy,* 25 F.3d at 152. Routine reliance on this practice of obtaining a waiver whenever the district court finds that defense counsel has even a potential conflict claim would often obviate the need for courts of appeals to engage in the "intricate task" of resolving Sixth Amendment conflict of interest claims. *Id.*

Even when the record demonstrates that the district court determined that a potential or actual conflict existed, failure to obtain a waiver does not in and of itself constitute reversible error if there could be no prejudice to defendant. Rather,

> [w]hen a [district] court fails to obtain from the defendant an adequate waiver of the conflict, the defendant still has not suffered ineffective assistance of counsel unless his attorney has either (1) a poten-

tial conflict of interest that resulted in prejudice to the defendant; or (2) an actual conflict of interest that adversely affected the attorney's performance.

*Lussier,* 71 F.3d at 463; *see also Levy,* 25 F.3d at 152–53.

The case is remanded for clarification of the record: to determine whether defense counsel had a potential conflict, an actual conflict, or no conflict at all. If the district court finds that there was neither a potential nor an actual conflict, the district court need take no further action.

If a potential or actual conflict is found to have existed, because there was no *Curcio* waiver, the district court should conduct a hearing to determine the possible effect on appellant. Should the district court find that (1) a potential conflict of interest might have resulted in prejudice to appellant; or (2) an actual conflict of interest might have adversely affected defense counsel's performance, a new trial would be required.

We remand for supplementation of the record in accordance with the foregoing. The mandate shall issue forthwith. This appeal will be reinstated, without need for a new notice of appeal, upon notice by either party to this Court by letter that the district court has supplemented the record. The matter shall be referred to this panel.