## UNITED STATES of America, Appellee,

v.

Kerwin BLOUNT, aka Jamaican, aka John Curly, and Lloyd Streater, aka Kevin Cash, aka Fat Boy, Defendants–Appellants.

Docket Nos. 00–1384(L), –1423.

United States Court of Appeals, Second Circuit.

Argued: Dec. 19, 2001.

Final briefs submitted Feb. 7, 2002.

Decided: May 30, 2002.

H. Gordon Hall and William J. Nardini, Assistant United States Attorneys, New Haven, CT (John A. Danaher III, United States Attorney for the District of Connecticut, Peter D. Markle, Assistant United States Attorney, New Haven, CT, on the brief), for Appellee.

Jeffrey G. Pittell, New York, NY, for Defendant–Appellant Blount; Kerwin Blount, Fairton, NJ, filed a brief pro se.

Sheila A. Huddleston, Hartford, CT (Thomas K. Jones, Shipman & Goodwin, Hartford, CT, on the brief), for Defendant–Appellant Streater.

Before: MESKILL, KEARSE, and CALABRESI, Circuit Judges.

KEARSE, Circuit Judge.

Defendants Lloyd Streater ("Streater") and Kerwin Blount appeal from judgments entered in the United States District Court for the District of Connecticut following a jury trial before Ellen Bree Burns, *Judge,* convicting each defendant on one count of conspiracy to possess with intent to distribute cocaine and cocaine base between March 3, 1991, and November 20, 1997, in violation of 21 U.S.C. § 846 (Count One), and convicting Streater on two counts of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (Counts Two and

Three). Streater was sentenced principally to concurrent 480–month prison terms on Counts One and Two and to a concurrent 240–month prison term on Count Three, the prison terms to be followed by five years of supervised release. Blount was sentenced principally to 292 months' imprisonment, to be followed by a 10–year term of supervised release. On appeal, both defendants contend that the district court erred in refusing to sever their trial from that of a codefendant and in calculating the drug quantities attributable to them for purposes of sentencing, and that their sentences violate the ruling in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In addition, Streater contends that he was denied effective assistance of counsel because his attorney had a conflict of interest that the district court failed to explore adequately; Blount contends that the district court erred in enhancing his sentence for his role in the conspiracy and for attempted obstruction of justice. Finding no basis for reversal, we affirm.

## I. BACKGROUND

The present appeals arise out of the prosecutions of Streater, Blount, and 10 other persons in connection with a cocaine distribution organization headed by Streater from the late 1980s until November 1997 in the Newhallville section of New Haven, Connecticut. After most of their codefendants pleaded guilty to various offenses, the remaining defendants, including Streater, Blount, and Todd Reynolds, were charged in a superseding indictment on one count of conspiring to possess with intent to distribute cocaine and cocaine base; Streater was also charged with two counts of possessing cocaine with intent to distribute. Streater, Blount, and Reynolds, along with a codefendant who subsequently pleaded guilty, went to trial.

At the five-week trial, the government's evidence included videotapes of undercover sales of cocaine; audiotapes of intercepted telephone conversations pertaining to cocaine distribution; and testimony from law enforcement agents, from would-be rival drug dealer Otis Todd Bivens, and from cooperating codefendants Joseph Pollard, Felicia Best, Charles Fluitt, Torrance Lee, and Troy Streater (Streater's cousin). The trial evidence, the sufficiency of which is not challenged on these appeals, revealed the following.

### A. The Government's Evidence as to the Organization's Operations

Beginning in the late 1980s, Streater purchased multi-kilogram quantities of cocaine in New York and brought it back to Newhallville, where he had it diluted, packaged in distinctive tamper-proof bags, and sold primarily in areas near the intersection of Newhall and Lilac Streets (collectively the "Newhall/Lilac" area). Each of the cooperating codefendants testified that this narcotics organization was owned and run by Streater; as described in Part II.D.2. below, they testified that Blount was a lieutenant in the organization from 1994 or 1995 until the time of his arrest in late 1997.

As described in Part II.D.1. below, the cooperating witnesses described the quantities of cocaine purchased and sold by the organization. Pollard, who participated in 1989–1993 and again in 1995–1997, testified that he worked for Streater bagging cocaine during the earlier period, bagging between four ounces and a half-kilogram of cocaine once or twice a week. He testified that from 1995 through October 1997, he traveled to New York either alone, or with Streater, Blount, or Best, to purchase cocaine for the organization, making such trips at least once a week. On each trip, with money given to him by Streater, Pol-

lard purchased between 250 grams and one kilogram of cocaine. Best testified that Blount went on such buying trips every two weeks in 1996–1997 and that she often accompanied him. On those trips, they would acquire one-kilogram quantities of cocaine.

Fluitt, Lee, and Troy Streater sold cocaine on the street for Streater. As discussed in Part II.D.1. below, they would be given bundles of cocaine packages to sell; on busy days, Streater or Blount would come along and replenish their supplies. Troy Streater described street sales approaching or exceeding an average of a half-kilogram of cocaine per week.

The government also presented evidence that Streater maintained discipline among his workers and control for his organization in the Newhall/Lilac area through physical violence, threats, and intimidation. Fluitt, for example, testified that he was beaten by Streater or Blount on a number of occasions, sometimes for "messing up the money" and sometimes for refusing to sell cocaine. (Trial Transcript, November 17, 1999 ("Nov. 17 Tr."), at 194, 199, 214–15; Trial Transcript, November 18, 1999 ("Nov. 18 Tr."), at 30).

Bivens testified that he had sold cocaine for Streater in the late 1980s and had gone to prison as a result. After being released in early 1991, he and Streater had a falling-out over Streater's failure to provide Bivens's mother with money during Bivens's incarceration. Some two months later, Bivens began attempting to sell cocaine on his own in the Newhall/Lilac area. Shortly after he began, Streater appeared and warned him to "get off the corner." (Trial Transcript, November 16, 1999 ("Nov. 16 Tr."), at 98.) Two days later, as Bivens and his brother were standing on a corner at Newhall and Lilac, a man, whom Bivens had never seen theretofore but identified at trial as Reynolds, approached

and asked which of them was Todd Bivens. When neither brother responded, Reynolds pulled out a gun. After Bivens struggled with Reynolds for the gun, Bivens let go and began to run. Reynolds shot him three times, twice in the back and once in the hip.

A few minutes before Reynolds approached and shot him, Bivens had seen Reynolds across the street talking with Streater. And after Bivens was released from the hospital some months later, and was recovering from his gunshot wounds, Streater approached him and said, "I told you something was going to happen to you. When I say something is going to happen to somebody, it always does." (*Id.* at 108.) Bivens understood Streater to mean that the shooting had been ordered by Streater.

Reynolds, at trial, did not dispute that he had shot Bivens. (*See, e.g.,* Nov. 16 Tr. at 114–15 ("Mr. BLOSS [Streater's attorney]: Are you admitting to the fact that Todd Reynolds shot Todd Bivens? Mr. KOCH [Reynolds's attorney]: The way I am cross-examining him, I think it is pretty evident.").) Rather, Reynolds, who was charged only with conspiracy to distribute cocaine, and whose shooting of Bivens was his only alleged participation in the conspiracy, took the position that the shooting simply had nothing to do with narcotics trafficking. (*See id.* at 238 ("Mr.KOCH: . . . . We are not disputing the shooting. We are disputing that the shooting was part of a conspiracy.").) Streater's attorney moved for a severance, arguing that his case had been misjoined with the prosecution of Reynolds and that Reynolds's position created

inconsistent defenses. . . . In other words, . . . it is Mr. Reynolds's position that, ["]I may have done it, but even if I did, I am not part of the conspiracy.["]

It is my position that Mr. Bivens was shot, but the Government hasn't proved it and can't prove it and won't prove that it was Mr. Reynolds acting at Mr. Streater's behest that did the shooting. So, there are clearly different positions here.

(Nov. 16 Tr. at 184–85; *see also id.* at 239 (Streater's counsel also taking the position that Reynolds in fact did not shoot Bivens).)

The district court reserved decision and ultimately denied the motion. The court noted that "[t]he facts presented [with respect] to Mr. Reynolds are still in the trial irrespective of whether he is physically present, and insofar as Mr. Streater is concerned, the evidence which [was] introduced [with respect] to Mr. Reynolds is still applicable to Mr. Streater. It just doesn't disappear from the case." (Trial Transcript, December 7, 1999, at 19–20.)

### B. *The Defense Case*

Streater testified at trial that he had never sold cocaine. Blount testified that although he had sold marijuana and cocaine in the Newhall/Lilac area between 1994 and 1997 and knew other codefendants who were selling in that location, he had never sold cocaine for Streater and was not a member of the alleged conspiracy. Blount also testified that he had never provided bundles of cocaine for others to sell, that he was not Streater's lieutenant, and that he had never gone to New York to purchase cocaine for either himself or Streater.

### C. *The Verdicts and Sentences*

The jury returned verdicts of guilty against Streater on all three counts. As to Blount and Reynolds, who were charged only in the conspiracy count, the jury found Blount guilty and Reynolds not guilty.

The presentence report ("PSR") prepared on each defendant estimated that the Streater organization had distributed approximately a half-kilogram of cocaine a week. Noting that Blount had been a participant in the conspiracy for approximately 2½ years, the PSR on Blount recommended that he be held responsible for a half-kilogram of cocaine a week for 120 weeks, or a total of 60 kilograms. On that basis, Blount's base offense level under the Sentencing Guidelines ("Guidelines") was 36. *See* Guidelines § 2D1.1(c)(2) (drug table) (1998) (offense level 36 for offenses involving at least 50 but less than 150 kilograms of cocaine). The PSR recommended a three-step increase in offense level pursuant to Guidelines § 3B1.1(b) on the ground that Blount was a supervisor of an operation that involved five or more participants, plus a two-step increase pursuant to Guidelines § 3C1.1 for attempted obstruction of justice on the ground that Blount had perjured himself at trial, giving him a total offense level of 41. In light of Blount's criminal record, the Guidelines-recommended range of imprisonment for Blount was thus 360 months to life.

The district court rejected Blount's objections to these recommendations and concluded that his total offense level was 41. However, the court granted Blount a two-level downward departure for extraordinary rehabilitation and sentenced him to 292 months' imprisonment, to be followed by a 10–year period of supervised release.

The PSR prepared on Streater, based on the estimated sales of a half-kilogram of cocaine a week, recommended attributing to him 26 kilograms a year, for a total of approximately 200 kilograms of cocaine for the eight-year duration of his operation. The recommended base offense level for Streater was thus 38, *see* Guidelines § 2D1.1(c)(1) (drug table) (1998). The PSR recommended a four-step offense-lev-

el increase pursuant to Guidelines § 3B1.1(a) on the ground that the organization involved five or more participants and that Streater was its leader, plus a two-step increase pursuant to Guidelines § 3C1.1 for attempted obstruction of justice on the ground that Streater had committed perjury at trial, for a total offense level of 44. That level was reduced to 43 pursuant to Guidelines Chapter 5, Part A, Sentencing Table, Application Note 2 ("An offense level of more than 43 is to be treated as an offense level of 43.").

The district court rejected Streater's objections to the recommended increase for attempted obstruction of justice, but it reduced the quantity of cocaine attributed to him, stating,

> I think that conservatively we can place Mr. Streater somewhere close to 120 kilograms. And in this case, we will consider the testimony of all of the witnesses, including the fact that the Court [*sic*] is somewhat overlapping so that we wouldn't want to double count anything.
>
> I think ... 120 ... is ... a conservative estimate taking into consideration that there was a period of time when Mr. Pollard was not involved that we really were unclear as to how much could be attributed to the conspiracy during that period of time.
>
> ... I think that a study of the record might support a higher figure.

(Sentencing Transcript, May 25, 2000 ("Streater S.Tr."), at 7–8.)

The finding that Streater was responsible for 120 kilograms placed his base offense level at 36, *i.e.*, within the 50–150 kilogram range; with the four-step and two-step adjustments for role and obstruction, respectively, his total offense level was 42. The Guidelines-recommended range of imprisonment for that level was 360 months to life, and the court sentenced

Streater to two concurrent 480–month terms on Counts One and Two, and a concurrent 240–month term on Count Three, with the prison terms to be followed by five years of supervised release.

## II. DISCUSSION

On appeal, Streater and Blount contend that the district court erred in refusing to allow them to be tried separately from Reynolds and in calculating the quantities of cocaine attributable to them, and that their sentences violate the ruling in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435. In addition, Streater contends that he was denied effective assistance of counsel because an attorney in his counsel's law firm had represented Bivens; Blount challenges the role and obstruction adjustments to his offense level. For the reasons that follow, we find no basis for reversal.

### A. *Denial of the Severance Motion*

■ As indicated in Part I.A. above, Streater moved during trial for a severance on the ground that his case and that of Reynolds had been misjoined and should be tried separately in light of their inconsistent defense positions. On appeal, both Streater and Blount contend that there should have been a severance. Blount, however, did not move for a severance in the district court, and hence he is not entitled to pursue this contention on appeal. We reject Streater's severance argument for the reasons that follow.

■ In the federal system, "[t]wo or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses," Fed.R.Crim.P. 8(b), and there is a "preference in the federal system for

joint trials of defendants who are indicted together," *Zafiro v. United States,* 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993); *see also United States v. Salameh,* 152 F.3d 88, 115 (2d Cir.1998) (per curiam), *cert. denied,* 525 U.S. 1112, 119 S.Ct. 885, 142 L.Ed.2d 785 (1999); *United States v. Miller,* 116 F.3d 641, 679 (2d Cir.1997), *cert. denied,* 524 U.S. 905, 118 S.Ct. 2063, 141 L.Ed.2d 140 (1998). A trial need not be severed simply because codefendants raise conflicting defenses. *See, e.g., Zafiro v. United States,* 506 U.S. at 538–39, 113 S.Ct. 933, 122 L.Ed.2d 317.

The court may sever counts or defendants in a trial if "it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants...." Fed.R.Crim.P. 14. The decision whether to sever is "committed to the sound discretion of the trial judge," *United States v. Diaz,* 176 F.3d 52, 102 (2d Cir.) (internal quotation marks omitted), *cert. denied,* 528 U.S. 875, 120 S.Ct. 181, 145 L.Ed.2d 153 (1999), and the denial of a severance motion should be reversed only when a defendant can show "prejudice so severe as to amount to a denial of a constitutionally fair trial," *id.,* or "so severe that his conviction constituted a miscarriage of justice," *United States v. Rosa,* 11 F.3d 315, 341 (2d Cir.1993), *cert. denied,* 511 U.S. 1042, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994).

We find no merit in Streater's contention that the district court abused its discretion in denying his motion for severance. First, the joinder of Streater and Reynolds was entirely proper, given the allegation that Reynolds shot Bivens at the behest of Streater in furtherance of Streater's desire to protect control of his narcotics distribution territory.

Second, although Streater argues that his and Reynolds's defenses were "mutually antagonistic and irreconcilable" (Streat-

er brief on appeal at 12), that characterization is contradicted both by Streater's statement to the trial court that he and Reynolds "both agreed that ... Mr. Streater did not ask Mr. Reynolds to shoot Mr. Bivens in furtherance of any kind of cocaine conspiracy, or for any other reason [for] that matter" (Nov. 16 Tr. at 239), and by his argument on this appeal that the joint trial "deprived [him] of the opportunity to compel Mr. Reynolds to testify that Reynolds performed the shooting and that the shooting was not (despite the government's speculation) ordered by Mr. Streater." (Streater brief on appeal at 13.) Nor were the two positions inconsistent on their face. At trial, Streater testified that he had not been involved in selling cocaine. It would have been entirely consistent for the jury to accept both that testimony and Reynolds's position that he shot Bivens for reasons unrelated to narcotics trafficking.

Finally, as the district court indicated, the joint trial did not cause Streater any prejudice. Bivens's testimony (a) that he had seen Streater talking to Reynolds just minutes before the shooting, (b) that Streater had warned him two days before the shooting to "get off the corner," and (c) that Streater, after the shooting, pointed out that he had warned Bivens and that his warnings were prophetic, would all have been admissible in a trial of Streater alone.

In sum, we see no abuse of discretion in the court's refusal to sever the trials of Streater and Reynolds.

### B. *Streater's Lawyer's Alleged Conflict of Interest*

Streater's trial attorney was William M. Bloss. The government's second witness at trial was Todd Bivens. On the first day of trial, William F. Dow, III, an attorney in Bloss's firm, informed Bloss and Assis-

tant United States Attorney ("AUSA") H. Gordon Hall, the government's lead trial counsel, that Dow represented Bivens in an unrelated criminal case in Connecticut Superior Court. Prior to calling Bivens as a witness, the AUSA informed the court as follows:

> MR. HALL: Just before the jury comes out and just as I said several times earlier today in summary fashion, there was a matter that arose at the conclusion of the proceedings this morning involving the Government's next witness, Otis Todd Bivens.
>
> There was a question of whether there might be a conflict insofar as Mr. Bloss represents Mr. Streater in this case and that his colleague, Mr. Dow, apparently represents Mr. Bivens in another case.
>
> It is my understanding that Attorney Casale [new counsel retained by Bivens] was contacted. I know that Attorney Casale did discuss the situation with Mr. Bivens at some length, and apparently all issues have been resolved, and we are prepared to go forward.
>
> MR. BLOSS: I would just add, your Honor, I didn't have a face with Mr. Bivens' name, but in seeing him, he is a little distinctive; and I have exchanged words with him at the superior court along the lines of when is Mr. Dow getting here? I never had any substantive conversation with him at all. I just wanted to put that on the record.

(Nov. 16 Tr. at 85–86.) Nothing further was said at that point, and the government proceeded to present its case, calling Bivens as its next witness.

The next mention on the record of Dow's representation of Bivens occurred during cross-examination of Bivens, as Bloss attempted to show that Bivens hoped his testimony against Streater in the present case would help Bivens "stay out of jail" (*id.* at 153) in the state-court case against

him. In the course of this examination, Bivens testified that in his state-court case he was no longer represented by Bloss's associate:

> A. .... I had an attorney in your firm.
> Q. Well, you don't have him anymore?
> A. No.
> Q. He is not representing you?
> A. As of Sunday.
> Q. You have another lawyer, right?
> A. Yes.

(*Id.* at 153–54.) So far as we are aware, the matter of Bivens's prior representation by a member of Bloss's firm was not mentioned again.

On this appeal, Streater contends that his Sixth Amendment right to the effective assistance of counsel was violated because Bloss had a potential conflict of interest as a result of the "simultaneous representation of an accused and his accuser" (Streater brief on appeal at 15). He argues that the court "had a duty to inquire further regarding the nature and extent of the potential conflict and failed to do so. As such, prejudice is inferred without further showing, and Mr. Streater is entitled to a new trial." (*Id.* at 17.) Assuming that the above information required the court to make further inquiry, we nonetheless reject Streater's contention in light of the Supreme Court's recent decision in *Mickens v. Taylor*, —— U.S. ——, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002).

A defendant's Sixth Amendment right to the effective assistance of counsel includes the right to be represented by an attorney who is free from conflicts of interest. *See, e.g., id.* at 1241; *Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981); *Holloway v. Arkansas*, 435 U.S. 475, 481–82, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). The right may be violated if the attorney has "(1) a potential

conflict of interest that resulted in prejudice to the defendant, or (2) an actual conflict of interest that adversely affected the attorney's performance." *United States v. Levy*, 25 F.3d 146, 152 (2d Cir. 1994). "An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." *United States v. Schwarz*, 283 F.3d 76, 91 (2d Cir.2002) (quoting *Winkler v. Keane*, 7 F.3d 304, 307 (2d Cir.1993) (internal quotation marks omitted), *cert. denied*, 511 U.S. 1022, 114 S.Ct. 1407, 128 L.Ed.2d 79 (1994)).

A conflict may be rooted in the attorney's prior representation of a person whose interests are antagonistic to those of his present client. *See, e.g., Mickens v. Taylor*, —— U.S. at ——, ——, 122 S.Ct. at 1240, 1245; *United States v. Lussier*, 71 F.3d 456, 462 (2d Cir.1995), *cert. denied*, 517 U.S. 1105, 116 S.Ct. 1321, 134 L.Ed.2d 474 (1996); *Ciak v. United States*, 59 F.3d 296, 305–06 (2d Cir.1995). A conflict-of-interest claim may also be grounded in the fact that two lawyers from the same firm represent two codefendants, even in unrelated proceedings. *See, e.g., United States v. Jiang*, 140 F.3d 124, 127 (2d Cir.1998) (per curiam).

In order to "ensure that a criminal defendant's right to conflict-free counsel is not abridged," *id.*, an initial inquiry is required when "the trial court knows or reasonably should know that a particular conflict exists," *Cuyler v. Sullivan*, 446 U.S. 335, 347, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) ("*Sullivan*"). When the court is "sufficiently apprised of even the possibility of a conflict of interest," its initial obligation is to "investigate the facts and details of the attorney's interests to determine whether the attorney in fact

suffers from an actual conflict, a potential conflict, or no genuine conflict at all." *United States v. Levy*, 25 F.3d at 153. *But see United States v. Stantini*, 85 F.3d 9, 14, (2d Cir.) ("Dual representation in separate but related proceedings, without more, does not trigger the inquiry obligation."), *cert. denied*, 519 U.S. 1000, 117 S.Ct. 498, 136 L.Ed.2d 390 (1996). Until the Supreme Court's decision in *Mickens v. Taylor*, this Court had generally held that a failure by the district court to conduct that initial inquiry warranted an automatic vacatur of the conviction and a new trial. *See, e.g., United States v. Rogers*, 209 F.3d 139, 146 (2d Cir.2000) ("[A] possible conflict existed, prompting a duty of inquiry. Because the district court failed to perform this duty, we vacate Rogers's conviction pursuant to the automatic reversal rule set forth in [*United States v.*] *Levy*, 25 F.3d at 153–54"); *Ciak v. United States*, 59 F.3d at 307 (defendant's attorney's "actual and possible conflicts of interest require automatic reversal of [defendant's] conviction because the trial court failed to conduct any inquiry"); *see generally United States v. Levy*, 25 F.3d at 154 ("The Sixth Amendment requires automatic reversal ... when a trial court fails to conduct an inquiry after either a timely conflict objection, ... or if the court knows or reasonably should know [that] a particular conflict exists." (internal quotation marks omitted)).

In *Mickens v. Taylor*, the Supreme Court held that the trial court's failure to inquire into a potential conflict of interest on the part of the defendant's attorney, about which the court knew or reasonably should have known, does not automatically require reversal of the conviction, *see* —— U.S. at —— ————, 122 S.Ct. at 1244–45 (majority opinion), for "[t]he trial judge's failure to inquire into a suspected conflict is not the kind of error requiring a pre-

sumption of prejudice," *id.* at 1246 (Kennedy, J., concurring). In the absence of any suggestion by counsel that he cannot fulfill his duties to all of his clients,

> the trial court's failure to make the *Sullivan*-mandated inquiry does not reduce the [defendant's] burden of proof; it [i]s at least necessary, to void the conviction, for [the defendant] to establish that the conflict of interest adversely affected his counsel's performance.

*Id.* at 1245 (majority opinion).

> The constitutional question must turn on whether trial counsel had a conflict of interest that hampered the representation, not on whether the trial judge should have been more assiduous in taking prophylactic measures.... As the Sixth Amendment guarantees the defendant the assistance of counsel, the infringement of that right must depend on a deficiency of the lawyer, not of the trial judge. There is no reason to presume this guarantee unfulfilled when the purported conflict has had no effect on the representation.

*Id.* at 1247 (Kennedy, J., concurring).

 In the present case, the only potential conflict shown in the record arose from the fact that Dow, a member Bloss's firm, had represented the government's witness Bivens in an unrelated matter. Bloss himself had not represented Bivens, and Bloss informed the court that he had never had any substantive conversations with Bivens; indeed, Bloss had not even recognized Bivens's name. The trial record plainly indicates that Bloss did not perceive any conflicting loyalties on his part; and by the time Bivens testified, he had replaced Dow with new counsel.

Streater has not shown that Dow's prior representation of Bivens had any effect on Bloss's performance. For example, he has not suggested that Bloss had any information from, or with respect to, Bivens that could have been used in defense of Streater; nor has he proffered evidence of any plausible alternative defense that Bloss failed to present because of Dow's past representation of Bivens. The record shows that Bloss's cross-examination of Bivens was vigorous and thorough, and we see no basis whatever on which it could be concluded that Dow's prior representation of Bivens had any adverse effect on Bloss's representation of Streater. Accordingly, we reject Streater's Sixth Amendment claim.

### C. The Apprendi *Challenges*

Count One of the indictment charged Streater and Blount with conspiring to distribute cocaine, in violation of 21 U.S.C. § 846; Counts Two and Three charged Streater with possessing cocaine with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1). Counts One and Three did not specify the quantities of cocaine involved in those offenses. And although Count Two specified a quantity, to wit, 500 grams or more, the jury was not asked to make a finding with respect to cocaine quantity as to any of the three counts. Both defendants contend that because their sentences (a) were calculated in part with reference to the quantities of cocaine attributed to them by the district court, and (b) are in excess of the statutory maximum prison terms prescribed for indeterminate quantities of cocaine, their sentences violate the principle announced in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435.

 Because defendants did not assert these objections in the district court, their contentions are reviewable only for plain error, *see* Fed.R.Crim.P. 52(b); *United States v. Thomas*, 274 F.3d 655, 666 (2d Cir.2001) (en banc) ("*Thomas*"). Plain error is an error that is plain and

affects a defendant's substantial rights, *see, e.g., United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), and "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings," *Johnson v. United States,* 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (internal quotation marks omitted). "An error affects substantial rights if it is prejudicial and it affected the outcome of the district court proceedings." *United States v. McLean,* 287 F.3d 127, 135 (2d Cir.2002) ("*McLean*") (internal quotation marks omitted). For the reasons that follow, we conclude that although there was an error in the imposition of Streater's sentence, it does not meet the test for plain error; and we conclude that Blount's sentence does not constitute error at all.

### 1. *Streater*

To the extent pertinent to Streater in the circumstances of this case, the penalty sections applicable to § 841(a) offenses provide that a person found guilty of violating § 841(a) with respect to an unspecified quantity of cocaine "shall be sentenced to a term of imprisonment of not more than 20 years...." 21 U.S.C. § 841(b)(1)(C); *see also* 21 U.S.C. § 846 (penalties for conspiracy in violation of § 846 are the same as those prescribed for the substantive offense that was the object of the conspiracy). Streater contends that the imposition of a prison term in excess of 240 months on either Count One or Count Two was thus error and that the error was clear. The government properly concedes this much. Because the jury did not determine the quantity of cocaine involved in any of the three offenses, Streater was convicted of offenses involving indeterminate quantities. Under *Apprendi* and *Thomas,* Streater should not have been sentenced on any individual count to more than 240 months' imprisonment; the 480–

month sentences on Counts One and Two, respectively, thus exceed the 240–month statutory maximum for each count and constitute error.

However, the government contends that because the 480–month sentences were imposed concurrently, and because 240–month maximum prison terms should have been imposed consecutively in order to reach a sentence within the prescribed Guidelines range, Streater's substantial rights were not affected. In light of the Guidelines provisions for the imposition of consecutive sentences, we agree.

■■■ Where a defendant has been convicted of more than one offense and the total prison term mandated by the Guidelines exceeds the statutory maximum term for the most serious count of conviction, § 5G1.2(d) of the Guidelines requires the district court to "impose consecutive terms of imprisonment to the extent necessary to achieve the total punishment." *McLean,* 287 F.3d at 136 (internal quotation marks omitted). Where the sentence that has been erroneously imposed by the district court is identical to the sentence that is required by a proper application of § 5G1.2(d), the error does not affect the defendant's substantial rights. *See id.* at 137.

■■■ The total Guidelines-recommended range of imprisonment for Streater's three offenses was 360 months to life, and the Guidelines required that the prison terms for his offenses be imposed consecutively insofar as was necessary to reach the total 480 month punishment that the court found to be the appropriate sentence within that range. Thus, if the district court had applied § 5G1.2(d) as required, it would have imposed prison terms of 240 months on each of the three counts, running two of the terms concurrently, and running the third term consecutively to the

240 months imposed on the other two counts to reach 480 months, see, e.g., Mc-Lean, 287 F.3d at 136; United States v. McLeod, 251 F.3d 78, 83–84 (2d Cir.), cert. denied, —— U.S. ——, 122 S.Ct. 304, 151 L.Ed.2d 226 (2001). The correct aggregate sentence would thus have been a prison term identical to the sentence that was in fact imposed. In these circumstances, we cannot conclude that the error affected Streater's substantial rights.

### 2. *Blount*

Blount too, in his *pro se* brief, asserts that in light of the failure to submit the matter of cocaine quantity to the jury, his rights under *Apprendi* are violated by his 292-month sentence, and that the maximum prison term he could lawfully have received on Count One, the only count in which he was charged, was 240 months. We reject this claim because Blount, having previously been convicted of a narcotics felony, was subject to a statutory maximum prison term of not 240 months but 360 months.

■ To the extent pertinent here, the penalty provisions for a violation of § 841(a) provide that a person who commits such a violation with respect to an unspecified quantity of cocaine "after a *prior* conviction for a felony drug offense has become final ... shall be sentenced to a term of imprisonment of not more than *30 years* ...." 21 U.S.C. § 841(b)(1)(C) (emphases added). The government duly served and filed against Blount a second-offender information pursuant to 21 U.S.C. § 851 in order to trigger this provision. Accordingly, the 292 month sentence imposed on Blount did not exceed the applicable 360 month statutory maximum.

### D. *Sentencing Challenges*

Defendants make several challenges to the district court's calculation of their sentences under the Guidelines, contending principally that the court overestimated the quantities of cocaine attributable to them for purposes of determining their base offense levels. In addition, Blount contends that the court erred in increasing his offense level for playing a managerial role and for obstruction of justice.

■ In reviewing these challenges, we must "accept the findings of fact of the district court unless they are clearly erroneous and ... give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e) (1994). Thus, findings as to what acts were performed, what was said, what the speaker intended by his words, and how a listener would reasonably interpret those words will be upheld unless they are clearly erroneous. *See, e.g., United States v. Moreno*, 181 F.3d 206, 213 (2d Cir.) (estimate as to drug quantity), *cert. denied*, 528 U.S. 977, 120 S.Ct. 427, 145 L.Ed.2d 334 (1999); *Ellerby v. United States*, 187 F.3d 257, 259 (2d Cir.1998) (per curiam) (role in the offense); *United States v. Cassiliano*, 137 F.3d 742, 745 (2d Cir.1998) (obstruction of justice); *United States v. Shoulberg*, 895 F.2d 882, 884 (2d Cir.1990) (same). The district court's factual findings with respect to sentencing need be supported only by a preponderance of the evidence. *See, e.g., McLean*, 287 F.3d at 133 (drug quantity estimate); *United States v. Prince*, 110 F.3d 921, 925 (2d Cir.) (same), *cert. denied*, 522 U.S. 872, 118 S.Ct. 188, 139 L.Ed.2d 127 (1997); *United States v. Cassiliano*, 137 F.3d at 747 (factual predicates for a finding of obstruction of justice); *United States v. Brinkworth*, 68 F.3d 633, 641 (2d Cir.1995) (role).

With these principles in mind, we turn to the various challenges.

### 1. *Drug Quantity*

In disputing the quantities of cocaine to be attributed to them, Streater and Blount

contend principally that the court should have adopted a more conservative view of the testimony of Pollard and found that they were responsible for only 15–50 kilograms of cocaine, making their base offense levels 34, *see* Guidelines § 2D1.1(c)(3) (drug table) (1998), instead of 36. We disagree.

■■■■ Where there has been no seizure of narcotics, or where the quantity seized does not reflect the scale of the offense, the Guidelines require the district court to estimate the amount of drugs involved in the offense. *See, e.g.,* Guidelines § 2D1.1 Application Note 12; *McLean,* 287 F.3d at 133. In making such an estimate, the court has broad discretion to consider all relevant information, *see, e.g., United States v. Guevara,* 277 F.3d 111, 125 (2d Cir.2001); and given the wide latitude of the district court to make credibility determinations, *see McLean,* 287 F.3d at 133, the court is not restricted to accepting the low end of a quantity range estimated by a witness.

In the present case, the PSR estimated that Blount was responsible for approximately 60 kilograms of cocaine and that Streater was responsible for approximately 200 kilograms, based on the organization's distributions of approximately one-half kilogram a week and the respective lengths of their participation in the conspiracy. The district court concluded that, as to Blount, 60 kilograms was a more appropriate estimate than the 15-to-50 kilogram range he advocated, but the court noted that it was not relying solely on the PSR:

> [W]e did go to trial, and we heard the testimony of all of the witnesses. And based on that testimony, it seems to me that your suggestion with respect to ... 15 to 50 kilograms for Mr. Blount does not accurately reflect what I gather

from the evidence that was before the jury during the course of the trial.

> 60 kilograms also may not be absolutely precise. I'm sure it's not. But I think it comes closer to being the amount of cocaine which is attributable to Mr. Blount.

(Sentencing Transcript, May 18, 2000 ("Blount S.Tr."), at 39–40.) This finding was supported by detailed testimony both from coconspirators who purchased wholesale and from coconspirators who sold retail quantities on the street.

Pollard testified that during the period 1995–1997, he made cocaine-buying trips to New York for Streater at least once a week and bought between 250 grams and one kilogram of cocaine on each occasion. Thus, Pollard indicated that the quantities acquired by the organization ranged from a quarter of a kilogram to two kilograms a week. Best testified that for some two years at the end of the conspiracy period, Blount made a buying trip to New York once every two weeks and obtained bricks of cocaine measuring approximately 10″ × 6″ × 3″. It appears to be undisputed that the size of these bricks was consistent with a one-kilogram quantity of cocaine, thus averaging a half-kilogram a week.

After the cocaine was brought to Newhallville, it was packaged in plastic bags in ¼-gram quantities. The packages were bundled and given to the sellers. According to Troy Streater, the number of cocaine packages in each bundle ranged from 24 (*see* Nov. 18 Tr. at 223) to 34 (*see* Transcript, November 19, 1999, at 126; *see also* Trial Transcript, November 22, 1999, at 180 (Lee testified that there were initially 25 bags per bundle).) Pollard, who packaged cocaine, testified that there were as many as 100–110 bags per bundle. (November 30, 1999 ("Nov. 30 Tr."), at 187–88.) Thus, at ¼ gram per packet, a bundle would contain from 6–8½ grams of

cocaine (24–34 packets) to 25 or more grams of cocaine (100–110 packets).

Troy Streater testified that the organization's street sellers, working three shifts a day, worked every day except Sundays, with sales on Thursdays, Fridays, and Saturdays being "particularly good." (Nov. 18 Tr. at 228.) He testified that on an average day they sold a total of some 12–13 bundles; on a busy day they sold approximately 20 bundles. Thus, even if the sellers had only one busy day a week, and the remaining five days averaged 12 bundles, it was reasonable to estimate that they sold 80 bundles a week. Even at 24–34 quarter-gram packets per bundle (rather than the 100–110 packets described by Pollard), the organization's sales of 80 bundles a week would amount to 480–680 grams of cocaine a week. At 34 packets per bundle for the 120 weeks of participation by Blount, the total amount of cocaine sold was 81.6 kilograms, well above the 60 kilograms attributed to him. And even at 24 packets per bundle, or 480 grams a week, the quantity of cocaine attributable to Blount for his 120 weeks would have been 57.6 kilograms, which is still well above 50 kilogram floor for offense level 36.

In sum, we see no error in the district court's finding that Blount's base offense level was 36.

In sentencing Streater, the court also based its findings on the trial testimony and arrived at a quantity—120 kilograms, for a base offense level of 36—which was lower than the 200 kilograms (base offense level 38) recommended by the PSR, but higher than the 15–50 kilograms (base offense level 34) advocated by Streater. A base offense level no lower than 36 (for 50–150 kilograms) was plainly justified by the record.

First, the trial testimony made it clear that Blount reported to Streater and that Streater had ultimate control over all aspects of the organization. Streater was thus responsible for at least as much cocaine as Blount, who, as described above, was responsible for the organization's sale of at least 57.6 to 81.6 kilograms from 1995 until late 1997. Since the Guidelines base offense level is 36 for a defendant who is responsible for at least 50 but less than 150 kilograms of cocaine, Streater's offense level would have been 36 even if the court had attributed to him only 57 kilograms rather than 120 kilograms.

Second, Streater was plainly responsible for more cocaine than Blount, for the evidence was that Blount was a participant in the conspiracy for less than three years, whereas Streater ran the organization for some eight years. With respect to the first several years of the conspiracy, the evidence consisted largely of the testimony of Pollard, who stated that in 1989–1993 he bagged between four or five ounces and half a kilogram of cocaine for Streater once or twice a week. At four ounces once a week for that approximately four-year period, Pollard would have bagged or a total of 52 pounds (approximately 23.6 kilograms). Averaging the high end of Pollard's estimates, he would have bagged 1½ kilograms every two weeks, or 156 kilograms over the four year period. Thus, there was evidence that Streater was responsible for 24–156 kilograms of cocaine in 1989–1993, in addition to the 57–81 kilograms distributed in 1995–1997. Even taking the low end of the range for each of these periods, and disregarding entirely the intervening period during which Pollard was not a participant in the conspiracy, Streater was responsible for at least 81 kilograms of cocaine, which is well above the 50–kilogram floor for base offense level 36.

Finally, we note that Streater and Blount also contend that the court should

have found them responsible for only 15–50 kilograms of cocaine because the plea agreements of the cooperating codefendants stipulated to that range. This contention need not detain us long. The court was not required to view Streater and Blount in the same light as their coconspirators, for the evidence was that Streater and Blount ran the organization and that the other participants were subordinate to them. For example, Pollard testified that when he bagged cocaine for the organization, Streater would be present and would decide how much the cocaine should be diluted and what quantity of the cut cocaine was to be put in each individual bag. Streater fired Pollard in about March 1993 because he was "messing up" the diluting and bagging quantities. (Nov. 30 Tr. at 173–74, 187, 192–94.) Fluitt, a seller, testified that if he received customer complaints about the cocaine, he would relay them to Streater or Blount. (*See* Nov. 18 Tr. at 98.) He also testified that if he did not turn over to Blount the right amount of money for the quantity of cocaine he had sold, he would be verbally or physically abused by Streater or Blount. (*See* Nov. 17 Tr. at 196–99.)

■ Given the evidence of the overarching positions of Streater and Blount in the organization, the court was plainly entitled to infer that the total amounts of cocaine distributed by the organization, while not necessarily foreseeable to one of the lower-level participants, were plainly foreseeable to Streater and Blount.

### 2. *Blount's Role*

Section 3B1.1(b) of the Guidelines requires a three-step increase in offense level if "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive. . . ." Guidelines § 3B1.1(b). A defendant may properly be considered a manager or supervisor if he "exercise[d] some degree of control over others involved in the commission of the offense . . . or play[ed] a significant role in the decision to recruit or to supervise lower-level participants." *Ellerby v. United States*, 187 F.3d at 259 (internal quotation marks omitted); *see also* Guidelines § 3B1.1 Application Note 4.

■ In finding this provision applicable to Blount, the district court stated, "clearly in my view, [Blount] was a person who was higher in the hierarchy than the witnesses who testified against him. He was a lieutenant for Mr. Streater, and he deserves a three-point increase." (Blount S.Tr. at 40) This finding was amply supported by the trial evidence that Blount was the person in day-to-day charge of the street-selling aspects of the operation. For example, Fluitt, who worked for Streater off-and-on throughout the period in question testified that beginning in 1994 or 1995, Blount became Streater's "[l]ieutenant" in charge of sales. (Nov. 18 Tr. at 91.) He testified that Blount was in charge of distributing bundles of cocaine packages to the street sellers and collecting the proceeds of their sales. (*Id.* at 123–24.) Blount was responsible for "mak[ing] sure everything [was] running straight," that money was being accounted for, and that the "work [kept] coming" at Lilac/Newhall. (*Id.* at 91.) Troy Streater testified that Blount regularly drove through the area checking on whether Troy was still at work, inquiring whether he needed more bundles, replenishing the sellers' supplies, and collecting the proceeds of their sales. Given this record, we see no error in the district court's finding that Blount was a supervisor or manager in the operation.

### 3. *Attempted Obstruction of Justice*

■ Guidelines § 3C1.1 requires a two-level increase in offense level if "the

defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction...." Guidelines § 3C1.1. This enhancement applies to "committing ... perjury," *id.* Application Note 4(b), which includes the giving of "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory," *United States v. Dunnigan,* 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993); *see also United States v. Hernandez,* 83 F.3d 582, 585 (2d Cir.1996) (to apply this adjustment, court must find that the defendant acted with the purpose of obstructing justice). In order to impose this enhancement, the sentencing judge need do no more than make a finding "that encompasses all of the factual predicates for a finding of perjury," *Dunnigan,* 507 U.S. at 95, 113 S.Ct. 1111.

The PSR on Blount recommended application of this adjustment on the ground that his trial testimony denying his involvement in the conspiracy to distribute cocaine constituted perjury. In response, Blount objected as follows: "Mr. Blount denies that he committed perjury. It is possible that the jury credited Mr. Blount's testimony, in which he admitted being a street-level dealer, but still determined that because of his close relationship with many of the codefendants, he was involved in the conspiracy." (Letter from Blount's attorney to the Probation Department, dated April 12, 2000 at 3.) In rejecting this objection, the district court stated:

> With respect to the obstruction of justice, Mr. Blount testified in a rather interesting defense that, yes, he was a drug dealer, but it was only in marijuana, it had nothing to do with cocaine,

and clearly, the witnesses against him refuted that testimony. And I can only perceive it as being perjurious and therefore the two point increase is appropriate.

(Blount S.Tr. at 40–41.) Blount challenges the obstruction enhancement on the sole ground that this finding "mischaracteriz[ed]" and "inaccurately recount[ed]" his testimony, because he in fact testified that he had trafficked in cocaine, albeit not in affiliation with Streater. (Blount brief on appeal at 33.). That was indeed Blount's repeated testimony at trial (*see, e.g.,* Trial Transcript December 13, 1999, at 142–44, 153–54; Trial Transcript December 14, 1999, at 40, 43–44, 47–49, 51–53, 68–69, 71, 73, 82, 92–93); and had there been no further discussion of this issue, we might well conclude that the court had erred.

However, after the court announced its sentencing findings, the AUSA directed the court's attention to its "expla[nation] to Mr. Blount and Counsel, the Court's recollection of what his testimony was on what he was doing out there," and stated that the AUSA's "recollection of the testimony was to the effect, at the end, *he was distributing cocaine, but for his own account,*" to which the district court responded, "Right." (Blount S.Tr. at 49 (emphasis added).)

Given Blount's repeated testimony that he had in fact distributed cocaine, and the district court's acknowledgement of that testimony in response to the government's corrective reminder, we conclude that the only reasonable interpretation of the court's finding is that Blount had perjured himself when he testified that he had not sold cocaine *for Streater.* We thus reject Blount's contention that the district court based the obstruction enhancement on a mistaken view of his trial testimony.

This being his only stated objection, we uphold the obstruction enhancement.

We note that the court's finding that "the witnesses against [Blount] refuted that testimony" was amply supported by the testimony of coconspirators such as Pollard, Best, Fluitt, and Troy Streater, discussed in Parts II.D.1. and 2. above, describing the functioning of Streater's organization and Blount's role as Streater's lieutenant.

CONCLUSION

We have considered all of defendants' arguments on these appeals and have found in them no basis for reversal. The judgments of conviction are affirmed.